UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

APARNA KUMAR,
,
                           Plaintiff,                         ECF CASE

        - against -

                                     <u>COMPLAINT</u>

OPERA SOLUTIONS OPCO, LLC, d/b/a ELECTRIFAI;
OPERA SOLUTIONS INTERMEDIATE, LLC; OPERA
SOLUTIONS HOLDING, LLC; OPERA SOLUTIONS          PLAINTIFF DEMANDS A
USA, LLC; ELECTRIFAI, LLC; WHITE OAK                <u>TRIAL BY JURY</u>
FINANCIAL, LLC; WHITE OAK GLOBAL ADVISORS
LLC; EDWARD SCOTT; and NANCY HORNBERGER,

                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>COMPLAINT</u>

Plaintiff Aparna Kumar ("Kumar" or "plaintiff"), through her attorneys Vladeck, Raskin & Clark, P.C., complains of (1) defendants Opera Solutions OPCO, LLC d/b/a ElectrifAi; Opera Solutions Holding, LLC; Opera Solutions Intermediate, LLC; Opera Solutions, LLC; Opera Solutions USA, LLC; and ElectrifAi, LLC (Opera and ElectrifAi entities collectively referred to herein as "ElectrifAi" or the "Company"); (2) White Oak Financial, LLC and White Oak Global Advisors, LLC (White Oak entities collectively referred to herein as "White Oak") (Opera, ElectrifAi, and White Oak entities collectively referred to herein as "Corporate Defendants"); and (3) individual defendants Edward Scott ("Scott") and Nancy Hornberger ("Hornberger") (Corporate Defendants, Scott, and Hornberger, collectively referred to herein as "Defendants") as follows:

## NATURE OF ACTION

1.      Kumar, an Indian woman, is a well-regarded and successful executive.  The Company, a data and technology firm that uses artificial intelligence and machine learning to assist private and government entities, hired Kumar in 2008.  During the 12 years Kumar has worked for the Company (including its predecessors), she excelled.  Kumar worked her way from business school intern to Senior Vice President.  Kumar has helped the Company build a robust government practice.  Kumar played a key role in the Company winning more than $103 million in government contracts and, until recently, served as an Account Manager for the Company's largest client, the Centers for Medicare & Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS") (collectively, "HHS-CMS"), including overseeing a team of more than 34 employees.

2.      Kumar's career progressed without impediment until late 2018.  In October 2018, White Oak staged a takeover of the Company and assigned one of its Partners and Managing Directors, Scott, a White man, to become the Company's new Chief Executive Officer ("CEO").  Upon his arrival, Scott targeted female and minority employees for harassment and discrimination.  Scott has no hesitation in making racist and sexist slurs.  Scott told Kumar that a Chinese client had said to him, "Ching Chong Ching Ching Chong, you fired"; and, on information and belief, called an employee, whom he later fired, a "fat lazy Black bitch."  Scott also repeatedly called Indian employees "dirty."  For example, in April 2019, Scott boasted to a former employee in trying to convince her to rejoin the Company, "I got rid of all the dirty Indians and it is safe for White people at Opera again."  In addition, when Scott apparently thought that Kumar said she was from India, Scott said to Kumar, "India? Eww. Why?"

3.      Kumar has complained repeatedly orally and in writing about Scott's biased conduct, including complaining to White Oak and meeting for several hours with an investigator that White Oak had retained and directed Kumar to speak to about her discrimination complaints. In addition, the Company's General Counsel and other executives for Corporate Defendants have witnessed firsthand some of Scott's unlawful behavior.  Nothing has been done to remedy the problems and Scott remains the CEO of the Company.

4.      Instead, for more than a year, Defendants have subjected Kumar to an ongoing campaign of discrimination, harassment, and retaliation.  While Kumar still works for the Company, Defendants have irreparably damaged her career. Defendants have repeatedly threatened to fire Kumar, demanded that she quit, and demoted her.  Defendants removed Kumar as the Account Manager for the HHS-CMS account and replaced her with a White woman. Further, Defendants have stripped Kumar of most of her strategic and leadership duties.  For example, Defendants have taken away Kumar's responsibilities to lead the recruiting and hiring process for the government practice group; to handle business development for the government practice group; to manage the effort to respond to Requests For Proposals ("RFP") for government contracts; to ensure that the government practice group met revenue targets and to present progress to the senior executives;  and to serve on company-wide leadership committees.  In addition, Defendants have inserted several layers of management between her and the senior executives and, on information and belief, Scott has directed those managers to continue his discrimination, harassment, and retaliation against Kumar.

5.      Plaintiff brings this action to remedy discrimination on the basis of her race and retaliation in violation of Section 1981 of the Civil Rights Act of 1966, 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964 ("Title VII").

6.     Plaintiff also brings this action to remedy discrimination on the basis of her race, national origin, and sex and retaliation, in violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 et seq. ("NJLAD"); the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. (the "NYSHRL"); and the Administrative Code of the City of New York § 8-101 et seq. (the "NYCHRL").

7.     Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, reasonable attorneys' fees and costs of this action, pre- and post- judgment interest, and other appropriate relief pursuant to Title VII, Section 1981, the NJLAD, NYSHRL, and NYCHRL.

## PARTIES, JURISDICTION, AND VENUE

8.     Kumar, who was born in India, became a United States citizen in 2002. She resides in New York State, spending approximately half of her time in New York City and half of her time in Ithaca, New York.  She began working for the Company in 2008.  Throughout Kumar's employment at the Company, she alternated between working regularly in the office and working remotely.  Between mid-October 2019 and the present, Kumar has worked remotely in New York State, including New York City.

9.     Upon information and belief, Defendant Opera Solutions OpCo, LLC d/b/a ElectrifAi, and its related entities including defendants Opera Solutions Holding, LLC; Opera Solutions Intermediate, LLC; Opera Solutions, LLC; Opera Solutions USA, LLC;  and ElectrifAi, LLC are limited liability companies formed under the laws of Delaware and headquartered in New Jersey.

10.     Defendants White Oak Financial, LLC and White Oak Global Advisors, LLC are limited liability companies formed under the laws of Delaware and headquartered in San Francisco.  They have offices in New York.

11.     Defendant Scott, a White man, is the current Chief Executive Officer ("CEO") of ElectrifAi. Scott also was a Partner and Managing Director at White Oak Global Advisors. Upon information and belief, when Scott initially served on the Company's Board, he was a Managing Director employed by White Oak Global Advisors. When Scott transitioned to become CEO of ElectrifAi, he remained a senior employee of White Oak Global Advisors until early 2020. Scott began serving as Kumar's supervisor and manager after joining Opera in 2018.

12.     Defendant Hornberger is an employee of ElectrifAi and currently holds the title of Executive Vice President, Revenue and Healthcare. Since 2019, Hornberger has served, directly and indirectly, as Kumar's manager and supervised her work.

13.     This Court has jurisdiction over plaintiff's Section 1981 claims under 28 U.S.C. § 1331 and plaintiff's Title VII claims because those claims arise under federal law. This Court has supplemental jurisdiction over plaintiff's NJLAD, NYSHRL, and NYCHRL claims pursuant to 28 U.S.C. § 1367 because these claims relate closely to the Section 1981 and Title VII claims, having arisen from a common nucleus of operative fact such that all claims form part of the same case or controversy.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Corporate Defendants do business in New York, New York and some of the acts of discrimination and retaliation occurred in New York.

15.     Plaintiff filed a charge with the United States Equal Employment Opportunity Commission (the "EEOC") on or about January 15, 2020, complaining of the acts of race, national origin, and sex discrimination and retaliation alleged herein. On or about August 17, 2020, the EEOC issued plaintiff a notice informing her of her right to sue ElectrifAi; and on or

about August 18, 2020, the EEOC issued plaintiff a notice informing her of her right to sue White Oak. Plaintiff has thus complied fully with all prerequisites required by Title VII.

16.     Pursuant to section 8-502(c) of the NYCHRL, plaintiff shall serve a copy of this Complaint on the City of New York Commission on Human Rights and the City of New York Corporation Counsel within 10 days of commencement of this action.

## FACTUAL ALLEGATIONS

### Kumar's Background

17.     Kumar was born in India and moved to the United States as a child. Kumar became a United States citizen in 2002.

18.     In 2002, Kumar graduated from University of Michigan, Ann Arbor, with two Bachelor of Science degrees in Mathematics of Finance and Economics.

19.     Between 2002 and 2007, Kumar worked at Progressive Casualty Insurance Company, where the company promoted her multiple times and she served as both a Competitive Intelligence Analyst and a Pricing Analyst.

20.     In 2007, Kumar began attending business school at The University of Chicago Booth School of Business. Kumar received her Master of Business Administration ("MBA") degree in Marketing and Strategic Management in 2009.

### Defendants' Background

21.     White Oak Global Advisors, LLC is a Securities and Exchange Commission-registered investment advisor and multi-billion alternative investment fund. White Oak specializes in private debt investment and providing secured loans to small and medium-sized businesses. White Oak is the ultimate owner of the Opera and ElectrifAi entities.

22.     ElectrifAi, formerly doing business as Opera Solutions, provides business intelligence services to private and public companies using data analytics and machine learning.

23.     Upon information and belief, in 2016, White Oak made a substantial loan to the Company. In July 2018, White Oak demanded that the Company repay the loan.

24.     When the Company did not pay the loan in time, White Oak ultimately took over ownership, including acquiring Opera's assets, and management of the Company. Corporate Defendants, as part of a rebranding effort, changed the name of the Company from "Opera" to "ElectrifAi" in or around the summer 2019.

25.     Since taking over the Company in 2018, Corporate Defendants have formed several limited liability companies and engaged in multiple complex transactions. For example:

- On information and belief, White Oak formed Opera Solutions OpCo, LLC as a successor entity to Opera Solutions, LLC in or around 2018.  White Oak placed ElectrifAi's assets in Opera Solutions OpCo, LLC.

- According to Corporate Defendants' filings with the federal government in 2019, Opera Solutions OpCo, LLC is a wholly owned subsidiary of Opera Solutions Intermediate, LLC, which is in turn owned by White Oak. Upon information and belief, Opera Solutions Holding, LLC is an entity used during the restructuring of the Company in 2018 and 2019. As of March 2020, the Company is now operating at least partially under the entity ElectrifAi, LLC for government contracting purposes.

- On information and belief, White Oak initially kept the employees of Opera Solutions in the entity called Opera Solutions USA, LLC.  In or around July 2020, Corporate Defendants moved the employees to yet another limited

7

liability company called ElectrifAi, LLC, which, on information and belief, is a subsidiary of Operation Solutions OpCo, LLC and ultimately owned by White Oak.

26.     The Corporate Defendants are closely related entities. For example:

- Upon information and belief, White Oak is the ultimate, and sole, owner of ElectrifAi and its related entities.

- White Oak has provided significant funding to ElectrifAi.  Furthermore, White Oak, working closely with ElectrifAi's accounting team, oversees ElectrifAi's finances.

- The ElectrifAi Board of Directors is entirely composed of White Oak executives, including Darius Mozaffarian, Partner and President of White Oak. Daniel Homrich ("Homrich"), a White Oak Associate, was the Secretary of Opera Solutions OpCo, LLC until January 2020. Scott was on ElectrifAi's board until he became the Company's CEO. Scott and Homrich were signatories on items related to Opera Solutions' financial accounts.

- When White Oak took over the Company, White Oak installed new management, including appointing Scott to serve as CEO. Upon information and belief, when Scott first assumed the position of CEO at ElectrifAi, he remained a senior employee of White Oak. Until Kumar filed her complaint with the EEOC, White Oak's website listed Scott as a Managing Director and a member of leadership team at White Oak.

- After Scott assumed leadership of ElectrifAi, he decimated its Human Resources department, as described below. As a result, White Oak has

handled some of the Human Resources complaints against Scott beginning in mid-2019. For example, when Kumar complained about Scott's conduct, her only option was to go to White Oak. Upon information and belief, White Oak, rather than ElectrifAi, hired an outside investigator to investigate Scott's conduct at ElectrifAi. In addition, White Oak's Director of Human Resources, Pam Hart ("Hart"), reached out to Kumar on several occasions after she made her protected complaints.

- In addition to Scott, other White Oak employees have provided services to ElectrifAi. For example, for several months in 2018 and 2019, Homrich, a White Oak Associate, worked at ElectrifAi's offices in Jersey City. Homrich was handling important aspects of ElectrifAi's finances, including overseeing the shutdown of its offices in India, New York City, and London.

- Plaintiff worked with White Oak employees. For example, in 2019, the Company sought a novation of its government contracts. Plaintiff worked on the novation transaction with Homrich. This novation was signed off by Barbara McKee, the Managing Partner and Co-Founder of White Oak.

<u>Kumar's Successful Career at the Company</u>

27.   Kumar is an executive who until recently had a successful career at ElectrifAi, formerly called Opera, for over a decade.

28.   Kumar began working at the Company in 2008 as an intern while enrolled at the Booth School of Business and became a full-time employee after receiving her MBA in 2009.

29.     During Kumar's tenure, the Company promoted her on four occasions: from Senior Associate to Engagement Manager; from Engagement Manager to Director; from Director to Vice President; and, most recently, from Vice President to Senior Vice President. Kumar has a strong track record leading successful teams at the Company and has helped numerous clients save millions of dollars and increase profitability.

30.     In August 2012, the Company won a three-year contract with HHS-CMS. Under the contract, the Company was to provide financial and operational analytics services for the Affordable Care Act's ("ACA") Health Insurance Marketplace (the "Marketplace"). The Company's management at the time asked Kumar to lead this account due to her prior success running projects and heading teams. In 2016, the Company appointed Kumar to serve as Account Manager for the HHS-CMS account and assigned her strategic responsibilities. Because of their work with HHS-CMS, Kumar's team is known within the Company as the CMS Team ("CMS Team").

31.     Kumar successfully led the CMS Team from 2012 to the present, totaling almost eight years. From 2014 to 2019, the HHS-CMS account was the largest revenue-generating client account at the Company. Upon information and belief, the HHS-CMS account is now responsible for most of the Company's revenue.

32.     Among other examples of Kumar's contributions and success with the HHS-CMS account:

- The Company and HHS-CMS have designated Kumar as a "Key Personnel" on the HHS-CMS account, meaning that both the Company and HHS-CMS deemed her participation essential to fulfillment of the contract.[1]

- The Company and HHS-CMS have designated Kumar as the "Project Director" on the HHS-CMS account, which means that she is responsible for "lead[ing] the organization and obtain[ing] the staff and resources necessary to conduct the task order"; for "all staff employed under this task order"; for "all work performed under this task order"; and for "the outcomes of the task order and the resolution of obstacles to achieving the outcomes necessary for success under this task order."

- Since the company appointed Kumar as lead of the CMS Team in 2012, she has been responsible for managing more than 34 analytics and technical development team members.  She also served as the primary contact with HHS-CMS, which includes approximately 50 clients.

---

[1]     48 CFR § 352.237-75 requires government contracts to include the following language concerning "Key Personnel":

> The key personnel specified in this contract are considered to be essential to work performance.  At least 30 days prior to the contractor voluntarily diverting any of the specified individuals to other programs or contracts the Contractor shall notify the Contracting Officer and shall submit a justification for the diversion or replacement and a request to replace the individual.  The request must identify the proposed replacement and provide an explanation of how the replacement's skills, experience and credentials meet or exceed the requirements of the contract . . . .

- Kumar helped secure "Excellent" Contractor Performance Assessment Reporting System ("CPARS") ratings for the Company during her eight years leading the CMS Team.

- Additionally, during her time on the CMS Team, Kumar has played a key role in winning over $103 million in government contracts. In 2015, when the Company's contract with HHS-CMS was set to expire, Kumar won a new three-year contract worth $28 million. Kumar helped the Company secure the contract over several other companies considered leaders in government contracting that presented lower bids. Kumar then increased the value of the contract to $68 million by helping the Company negotiate and win numerous modifications to the contract and, in 2016, ensured that the contract would remain in place when it appeared the ACA might be repealed.

33. Before White Oak took over management of the Company, Kumar reported directly to Ritin Khangarot ("Khangarot"), Senior Vice President and Healthcare Practice Lead. Khangarot, in turn, reported to the then-CEO Arnab Gupta.

34. Before the Company's discrimination and retaliation against Kumar, she was the Account Manager of the CMS account and performed the functions of a government practice lead. Kumar's duties included all aspects of the Company's government practice, including managing employees on the government practice team and recruiting, interviewing, and hiring and staffing for the Company's government practice group.

35. Kumar also handled business development for the government practice group, including identifying which government opportunities to pursue; developing relationships

with vendors that supported the government; drafting responses for new government contracts; and determining optimal pricing and legal compliance for each response. In particular, Kumar was responsible for managing and preparing the response to the government's RFP for the HHS-CMS contract.

36.     Between approximately 2016, when the Company appointed Kumar Account Manager, and the fall 2019, Kumar had Profit and Loss responsibilities for the government practice group.  For example, in 2018, the Company assigned Kumar the highest revenue target across all employees.  Kumar also had weekly meetings with the former CEO, Chief Financial Officer, Chief Operating Officer, and Healthcare Practice Lead to discuss progress regarding the revenue targets.

37.     Kumar also served on leadership committees during her tenure at the Company. In 2017 and 2018, she served on the five-member Calibration Committee that was responsible for evaluating and deciding on employee promotions at Opera. In January 2019, Kumar became a member of Opera's Management Committee, responsible for deciding Opera's strategic direction and operational goals.

38.     As set forth below, Defendants have removed Kumar from leadership positions and stripped away her strategic responsibilities. Also, as described below, after Scott learned about Kumar's protected complaints, he stopped interacting with her and inserted several layers of management between her and the most senior executives at the Company. On information and belief, Scott has directed those managers to carry out his discrimination, harassment, and retaliation against Kumar.

<u>Scott's Biased Conduct</u>

39.     Since becoming CEO, Scott has repeatedly made racist and other discriminatory comments and created a hostile work environment toward female and minority employees. His comments made it clear that non-White employees and women were unwelcome at the Company.

A.  <u>Scott's Racist Comments and Conduct</u>

40.     After White Oak, including Scott, took over the management of the Company, Corporate Defendants and Scott systematically fired hundreds of Indian and other non-White employees.

41.     At Kumar's first meeting with Scott in October 2018, Scott asked about her personal background and where she was from. Kumar told Scott she was from Ithaca, New York. Scott said "India? Eww. Why?" Kumar then repeated to him that she lived in Ithaca, which is in upstate New York. In response, Scott said that was a "relief."

42.     In January 2019, Scott asked Kumar to meet him in the boardroom. When she arrived, Scott closed the door. He said, "Guess who called me last night?" Scott then told Kumar that the Company's largest client in China had threatened to fire the Company. He used a racist slur in describing the discussion; Scott told Kumar that he had answered the phone at 10:30 p.m. and heard a voice say, "Ching Chong Ching Ching Chong, you fired."

43.     Also, sometime in spring 2019, Scott fired a Black woman who led a Company team that contracted with Johnson & Johnson. On information and belief, he had previously referred to this woman as a "fat lazy Black bitch."

44.     Scott repeatedly made derogatory comments about Indian people.  On multiple occasions, Scott used the term "dirty Indians."  For example, in April 2019, Kumar and

Scott had a one-on-one conversation in which Scott described a story of having rehired a former Company employee, who is White. Scott said to Kumar that he told the rehired employee, "I got rid of all the dirty Indians and it is safe for White people at Opera again."

45.     In April 2019, Kumar followed established protocol to have an existing Company employee of Indian origin join the CMS Team from another project. After the employee began working on the CMS Team in late April 2019, Scott stopped the employee in the hallway and confronted him. Scott asked him in sum and substance, "How the fuck did you get yourself staffed on CMS? You knew you were on my fired list." Scott then told Kumar that all hiring decisions should go through him.

46.     On several occasions, Scott referred to Company's former Indian management team as the "Indian Mafia." In late June 2019, Kumar conducted one-on-one meetings with several interns. Four of the female interns mentioned concerns about Scott's behavior. These women told Kumar that Scott had referred to the leadership team members he had fired as the "Indian Mafia" and made other inappropriate comments.

47.     In addition, many of the Company's employees were in the United States on work visas. Scott used this information to harass certain Indian and other non-White employees knowing that if they quit it would jeopardize their U.S. residency. He made remarks such as, "I have all these fuckers on visas by the balls."

B.     Scott's Discriminatory Treatment of Women

48.     In addition to Scott's racist comments and conduct, the Company, under Scott's leadership, frequently subjected female employees to different standards than male employees.

49.     For example, in early 2019, when Kumar asked to be placed on the Management Committee, Scott said he would approve her request but only because she was a woman in the field of technology.  Scott made it clear that Kumar was not getting the leadership opportunity because of merit and, instead, to help the Company's image.

50.     In June 2019, several female interns told Kumar that Scott had taken the male interns, most of whom were White, out for drinks while leaving out the women.

51.     Around the same time in June 2019, Scott fired numerous consultants – most of them women – whom he believed had sent an anonymous letter to White Oak about the discrimination they experienced under Scott. Also, upon information and belief, one of the female consultants who the Company had fired told a member of Kumar's team that her former manager had masturbated while she was in the room. Kumar raised this complaint to Diane Clark ("Clark"), the Company's General Counsel. Clark said she took these concerns seriously. The employee who had masturbated at work remained an employee of ElectrifAi until in or around February or March 2020.

52.     On information and belief, Scott told a female HR employee that she needed to fire four women and he did not care which women the Company selected.  On information and belief, the HR employee resigned as a result of Scott's directive.

53.     Other women, including female executives, have told Kumar that Scott regularly is condescending towards them and not the male employees.

Defendants' Discrimination Against Kumar and Efforts to Force Kumar to Leave the Company

54.     After Kumar asked for a promotion and raise in December 2018, Scott told Kumar that she was "replaceable" and that the Company had "plan B" and "plan C" to move forward without her.

55.    While Scott did not fire Kumar, during the summer and fall 2019, he started a campaign of harassment and intimidation against Kumar to force her out of the Company. For example, Scott repeatedly told Kumar to quit, threatened to fire her, made attempts to turn members of the CMS Team against Kumar, diminished her authority, demoted Kumar, and removed strategic responsibilities. Scott's effort had nothing to do with Kumar's experience, performance, or client relationships. Instead, Scott targeted Kumar because she is an Indian woman.

56.    Scott also belittled Kumar's contributions to the Company while praising those of White employees and men. For example, in August 2019, plaintiff secured a modification from HHS-CMS in which HHS-CMS agreed to pay the Company an additional $4.3 million. Kumar sent an email to Scott asking him to sign the modification and his only response was, "Got it" and "Will sign[.]" In contrast, when other employees secured new revenue for the Company, including smaller amounts, Scott sent company-wide emails and walked around the ElectrifAi offices ringing a cow-bell, showering those employees with praise.

A.    September 10 Meeting

57.    In the summer 2019, Scott hired a new executive team to fill the roles of the employees he had previously fired and to replace employees that he wanted to fire. Most of the new hires were White. These new hires included David Smith ("Smith") and Hornberger, who are both White and then shared the title of co-Executive Vice President, Healthcare. Upon information and belief, these new hires and other new White employees were given salaries that were substantially higher than Kumar's salary.

58.    In September 2019, Scott escalated his attempts to replace Kumar as the leader of the CMS Team. On September 3, 2019, Scott yelled at Kumar in front of numerous

17

employees in the middle of the ElectrifAi office. Scott accused Kumar, without any explanation, of running CMS "as an island" and demanded that the CMS Team travel to Jersey City because the Company paid their salaries. Scott then sent an announcement directing all CMS Team members to attend an in-person meeting at headquarters in Jersey City the following week on September 10, 2019.

59.     On information and belief, Scott's goal in hosting the September 10 meeting was to introduce Hornberger and Smith to CMS Team members as Kumar's replacements as leaders of the CMS Team. Scott also hoped to turn team members against Kumar. For example, during the September 10 meeting, which lasted all day, Scott paced the room and glared at Kumar while speaking. Scott's conduct during the meeting made clear that he did not like Kumar. Scott also attempted to solicit negative feedback about Kumar from CMS Team members by asking if they were happy working for Kumar or if they wanted a different manager. They did not respond.

60.     The next day, on September 11, 2019, Scott met with Kumar, Hornberger, Smith, and Matthew Brakora ("Brakora"), Vice President, Corporate Development. Scott appeared agitated. He said, in sum and substance, that the September 10 meeting "didn't fucking go as planned," that "[he was] done with [Kumar's] fucking games[,]" and that she needed to be either "all in or all out." Scott told Kumar that she could "quit right now and I [Scott] will have Nancy [Hornberger] and David [Smith] replace you on the team. I am tired of you keeping the CMS [T]eam on an island, not allowing them to interact with the rest of us. Remember when I told you I had a plan b and c, well here it is. Fucking quit." Scott then called Kumar a "terrible account manager and a terrible manager." Kumar left the meeting in tears.

61.     During the meeting on September 11, 2019, Scott threatened to demote Kumar. Scott told Kumar that Hornberger and Smith would be taking over the CMS account from her and that she needed to set up a meeting with the client to introduce them.

62.     Upon information and belief, a few days later, Scott met with Kumar's deputy on the CMS Team. Scott told Kumar's deputy that he planned to fire Kumar. Scott had made this decision before talking to the client. Kumar's deputy warned Scott that Kumar managed the client relationships and that, if Scott fired Kumar, the Company would likely lose the "recompete" for the CMS contract when the Company's contract with HHS-CMS expired in 2020.

B.      Defendants Demote Kumar, Fabricate Performance Concerns, and Remove Key Duties

63.     During the fall 2019, Scott began to blame Kumar for problems with employee retention on the CMS Team. From September 12 to October 4, 2019, five members of the CMS Team resigned; in total, more than a dozen employees have left the CMS Team since Scott became CEO. Upon information and belief, the September and October 2019 resignations were due to Scott's behavior leading up to and during the September 10 meeting. Prior to Scott's involvement with the CMS Team, Kumar had maintained a high employee retention rate for the industry. Several of these employees resigned after Scott's arrival in October 2018 without having secured job offers elsewhere. Upon information and belief, Scott then directed HR to conduct exit interviews with these employees several weeks after had left the Company and specifically told HR to ask the employees if they were quitting because of Kumar.

64.     Prior to Scott's arrival at the Company, there was minimal attrition on the CMS Team. Scott, however, sent Kumar an email stating the CMS Team resignations were "troubling and destabilizing" and asked Kumar to get "to the bottom of it[.]"  Scott also stated that

the departure of those employees provided him a basis to demote Kumar and appoint Hornberger as head of the CMS Team.

65.     After the September 11 meeting, as Scott had directed, Kumar scheduled a meeting with Scott, Hornberger, Smith, and the HHS-CMS client representatives. During the meeting on September 18, 2019, the HHS-CMS client representatives told Scott and the other executives that they were happy with Kumar's leadership and the performance of the CMS Team.

66.     After the September 18, 2019 meeting, Scott had no choice but to recognize Kumar's strong client relationships but did so in a belittling manner. Scott called her a "great project manager" and stated that his "goal" was to find additional projects like CMS for her to manage. By describing Kumar as a project manager, Scott was ignoring her broader contributions as the Account Manager of the CMS Team and purportedly a Senior Vice President. A project manager is responsible for a specific project and the scope of the project defines his or her responsibilities.  In contrast, an account manager deals with a specific client or clients on a long-term basis and serves as the face of the leadership team for that client relationship.

67.     Scott took away several important responsibilities from Kumar, including her authority to hire CMS Team members. In mid-September 2019, Kumar began the process of hiring employees to replace those individuals who had resigned. On October 1, 2019, Kumar sent an email to Scott about a new employee. Scott directed Kumar to send him, Clark (the General Counsel), and Chad Kidder ("Kidder"), Head of Talent for the Company, every resume she had received for the position. Kidder, who the Company had recently hired and who was not yet a full-time employee, asked Kumar several questions about the hiring process and suggested that she change her hiring criteria without understanding any of the client or delivery requirements of the

CMS Team. Scott instructed Kumar that all hiring should go through Kidder despite her successful track record of selecting and retaining employees for the CMS Team.

68.     On October 4, 2019, Scott sent a Company-wide announcement that Hornberger and Smith were the new Co-Heads of the Company's Healthcare Vertical and that the entire CMS Team, including Kumar, would now report to them, effectively demoting Kumar. Beyond Scott's threats, Kumar was not told of this change in leadership structure in advance. Hornberger subsequently sent an email stating that Kumar continued as the CMS "Program Manager."

69.     On October 15, 2019, during a management meeting, Kumar stated that the HHS-CMS client would like to participate in the hiring process for CMS Team members. Scott was incensed; he said that Kumar's proposal was "fucking ridiculous." Kumar told Scott that, in the past, HHS-CMS had played a role in selecting candidates for the team. Scott expressed that he did not believe Kumar and demanded that she had "better fucking get it to [Scott] in writing from the client first thing this morning."

70.     At the end of the October 15 management meeting, Scott asked Kumar to stay behind, along with several executives, including Hornberger, Smith, Clark, Brakora, and Kidder. Scott then falsely blamed Kumar for the CMS Team resignations. Scott was also critical of Kumar's statement that the client should play a role in hiring. In front of the executives, Scott stated that Kumar's actions were a "fucking disgrace." Kumar reminded Scott that the resignations were recent and that the request to be included in the interview process had come from the client. Scott repeated Kumar's words in a mocking tone and said, "Go fuck yourself. This is a disgrace." Scott does not use such a tone when interacting with White male managers.

71.     After the October 15 meeting, Kumar sent an email to Scott. Kumar told Scott that the way he talked to her was "hurtful and embarrassing—especially in front of everyone." Kumar repeated previous statements she had made that she was fully committed to developing and expanding the government practice. She emphasized how much time she was dedicating to cover missing team members' work and finding and hiring new candidates.

72.     The next day, on October 16, 2019, Scott attacked and attempted to humiliate Kumar in response to her October 15 email. Scott added several recipients to the email, including Clark, Hornberger, Smith, Brakora, Kidder, Deron Hurst ("Hurst"), and Juliana Rozario ("Rozario"). Scott wrote to Kumar that her behavior towards Kidder was unprofessional, that she had a "pattern of negative behavior," and that this would "not be condoned any further" as it was "antithetical to our values and culture." Scott also stated that Kumar had many opportunities to adjust to the team-oriented culture of the Company but had chosen "another, darker path." Scott asked Kumar to "reflect on the totality of [her] actions and whether they're consistent with the values and culture of ElectrifAi."

73.     In sharp contrast to Scott's incessant criticism of Kumar, the HHS-CMS client continued to praise her performance.  For example, in October 2019, HHS-CMS sent a letter to Scott and other members of the management team expressing concerns about staff turnover at the Company. The letter stated that "Opera's staff working under this task order have critical institutional knowledge developed over years on an incredibly complex program" and that the stability of the team was important to HHS-CMS. HHS-CMS also stated in the letter that Kumar's CMS Team was "extremely talented and highly skilled," which the client attributed to high hiring standards and exceptional retention of team members.

22

74.     Since October 16, 2019, Kumar has not returned to the office.   Instead, Kumar has worked remotely.   Several other members of the CMS Team also have not returned to the office after October 16, 2019 and worked remotely given the discriminatory environment.

<u>Scott Intimidated Employees and Suppressed Protected Complaints</u>

75.     Kumar was scared to complain about Scott's discrimination.

76.     Scott was the CEO of the Company and a senior level employee at White Oak.

77.     Also, after taking over the Company, Scott decimated its Human Resources ("HR") department. On information and belief, Scott forced out the Head of HR in March 2019. The two remaining HR employees then resigned.

78.     After the departure of the previous HR team, Scott announced in a management meeting that he and the General Counsel, Clark, were serving as HR.   Scott repeatedly joked about the lack of an HR department.   For example, Scott stated on more than one occasion that all HR complaints go to him.   Also, during late summer 2019, Scott placed a white board next to his desk and instructed employees to write their HR complaints on the white board.   As a result of Scott's dismantling of the Company's HR department, Kumar was concerned that a complaint to ElectrifAi's HR would not result in any remedial action and, instead, would lead to retaliation.

79.     Also, since Scott's takeover, Kumar knew of several employees that the Company fired after they had complained to HR.

80.     In addition, during Scott's tenure at the Company, he took several steps to increase surveillance of employees. Upon information and belief, Scott's goal in doing so was to intimidate employees and suppress protected complaints.   For example:

- In June 2019, Scott installed web cameras throughout the portion of the Jersey City area of the office called the "Bullpen." Scott instructed the Company's IT staff to make sure that everyone in the Bullpen was present during the installation, which had the effect of making employees aware that Corporate Defendants were recording them. Scott installed a camera immediately above Kumar's desk that allowed him to monitor her interactions at work.

- Scott also required employees to install software so he could track their communications and whereabouts. For example, in July 2019, Scott instructed employees to install Carbonite, which enabled Scott to replicate an employee's computer hard drive and access websites that the individual visited.

- Upon information or belief, around the same time, Scott actively used Mobile Iron to track employee location. In contrast, the prior management team used Mobile Iron to secure company property in case phones were lost or stolen.

- In August 2019, Kumar learned that Scott was actively monitoring employees key card activity to observe when employees were entering and exiting the Company's offices.

- During a CMS Team meeting in Jersey City, on September 10, 2019, Scott directed employees to leave their laptops and phones at the front of the room with Clark, the General Counsel. Scott threatened Kumar's team members, stating in sum and substance, "I know you are all using fucking free Skype

[to communicate with each other], but don't be fooled, I am watching your every move."

<u>Kumar Complains to White Oak About Scott's Unlawful Conduct</u>

81.     By mid-October 2019, Kumar believed that she had no choice but to complain as she could no longer endure the unlawful discrimination and harassment.  On October 16, 2019, Kumar and three members of her team visited White Oak's offices in Manhattan. They hoped to speak in person to a high-level executive about Scott's unlawful conduct. The employees spoke to an administrative assistant for Diane C. Altieri ("Altieri"), White Oak's Chief Operating Officer.  The administrative assistant said she would help Kumar and her team schedule a meeting with Altieri.

82.     The next day, on October 17, 2019, Kumar received a call from Pamela Hart ("Hart"), White Oak's Global Head of Human Resources. Hart told Kumar that her call was in response to Kumar's conversation with Altieri's administrative assistant. Kumar and her team members spoke to Hart to complain about, among other concerns, Scott's discrimination, including his racist and sexist comments. Hart told the employees that White Oak would investigate their claims. Hart also told Kumar and the other ElectrifAi employees that White Oak had already retained an attorney to investigate previous complaints against Scott and that they should schedule a time to meet with the investigator. After the initial discussion, Hart, Kumar, and the other employees communicated by text on multiple occasions about the employees' complaints.

83.     Before plaintiff's interview with Kathleen Einhorn, the attorney-investigator that White Oak had retained, Kumar asked the investigator for permission to have her counsel present for the meeting. Although the investigator stated that Kumar's lawyer could sit in during the interview, she specifically conditioned the attorney's attendance on an agreement that

he would not participate during the meeting. Because it was not useful for Kumar's attorney to attend simply as an observer and not as counsel, he did not go to the interview. Therefore, Kumar did not have counsel present for the meeting. The investigator also declined Kumar's request to review any summary or description of her statements during the interview to ensure that they were accurate.

84.     On October 22, 2019, Kumar met with the investigator for more than four hours. During the meeting, Kumar described Scott's discrimination against her, including his racist and sexist comments, his threats to fire her, his abusive language towards her, and his efforts to publicly humiliate Kumar. During the meeting, the investigator told Kumar that other employees had complained about Scott and that she was already investigating his alleged misconduct.

<u>Defendants Retaliate Against Kumar For Her Protected Complaints</u>

85.     After Kumar complained to White Oak in October 2019, Defendants engaged in numerous acts of retaliation.

86.     For example, Defendants removed Kumar as a member of the Management Committee. As of July 2020, the current members of the Management Committee are predominately White.

87.     In addition, Defendants removed Kumar's Profit and Loss responsibilities for the government practice group. Defendants took away Kumar's revenue targets and stopped having her present revenue information to senior management.

88.     Since October 16, 2019, Kumar has worked remotely and has not returned to the office. On October 23, 2019, Hornberger sent Kumar an email asking about her schedule and work location and why Kumar and CMS Team members had not been in the Jersey City office. From October 24 to October 30, 2019, Hornberger repeatedly insisted that Kumar should come to

the Jersey City office. Yet most of the CMS Team had always worked remotely. Indeed, for long stretches during her tenure at the Company, Kumar had worked remotely, and management had never previously raised such concerns.

89.     On October 30, 2019, Kumar sent an email to Rozario, a newly hired HR manager at the Company. Kumar complained to Rozario about the unlawful discrimination she faced at the Company. She wrote that Scott had made her workplace "a hostile and toxic environment because I am an Indian woman." Kumar told Rozario that she had been working remotely since October 16, 2019. Kumar further stated:

> Nancy Hornberger has told me it is imperative that I come to ElectrifAi's Jersey City office on Thursday, 10-31-19. Given the hostile environment and the discrimination I have faced, I am very uncomfortable going back to ElectrifAi's Jersey City office. I have lodged an official complaint with White Oak and would like to wait for them to resolve my complaints before coming back to the Jersey City office.

90.     In addition, Kumar sent an email to Hornberger informing her of Kumar's discrimination complaint. Kumar requested permission to continue working remotely given the hostile work environment. Initially, Hornberger rejected Kumar's request and demanded that she return to the Jersey City office on October 31, 2019. Kumar told Hornberger, that as had been the case for some time, she was able to complete her work remotely. After this email, Hornberger granted Kumar's request to work remotely.

91.     Even though ElectrifAi allowed Kumar to work remotely, the retaliation continued.

92.     For example, after Kumar filed her complaint with White Oak and engaged in other protected activities, ElectrifAi and Scott demoted her further. On October 28, 2019, the Company hired a "Program Director" and Kumar's new supervisor, creating another layer of management above Kumar in the Company hierarchy. Hornberger told the HHS-CMS client that

the Company hired the Program Director to oversee Kumar and function as an intermediary between Kumar and the Corporate Defendants' senior management team. Defendants did not notify Kumar or seek her input about their decision to hire the Program Director.

93.    On or about November 5, 2019, Hornberger imposed new obligations on Kumar to report her work activities. Hornberger instructed Kumar to write numerous daily reports to her and the Program Director. The Company had not previously asked Kumar to provide so much information about her daily work. Kumar expressed several concerns including that the onerous reporting obligations would interfere with her ability to complete client work. Moreover, upon information and belief, the Company does not require other employees to provide so much information, including those employees who have worked remotely.

94.    In addition, management excluded Kumar from key decisions and meetings concerning the HHS-CMS client and the CMS Team. For example, senior management did not seek Kumar's input in hiring four CMS Team members even though hiring had always been one of Kumar's job responsibilities during the contract with HHS-CMS. In addition, management arranged for several meetings with the HHS-CMS client representatives by phone and in-person and did not invite Kumar to those meetings.

95.    In addition to Kumar's complaints to HR and senior management, she also raised concerns about the discrimination and retaliation against her through her attorneys. By letter dated November 6, 2019, Kumar's attorneys notified Defendants that she had meritorious claims of race, national origin, and gender discrimination, and retaliation.

96.    Defendants' counsel replied on or about November 12, 2019. Counsel asserted that Defendants took Kumar's complaints "very seriously[,]" and that the Company's policies "strictly prohibit unlawful retaliation." Yet, in that same letter, Defendants accused Kumar

of not performing her work responsibilities and admonished her not to violate the Company's IT security and usage policy. Far from reassuring Kumar that Defendants would not retaliate against her, the letter's tone was threatening and appeared to have the purpose of dissuading Kumar from pursuing her protected complaints.

97.     In early December 2019, ElectrifAi introduced yet another senior manager to the CMS Team, a Senior Vice President, Global Head of Delivery. The Global Head of Delivery is a White woman. Hornberger, the Program Manager, and the Global Head of Delivery proceeded to have weekly meetings with the HHS-CMS client representatives but excluded Kumar. The HHS-CMS client asked the Company to include Kumar in these meetings and, only after that request, ElectrifAi executives then asked Kumar to participate.

98.     In or around late December 2019 or early January 2020, the Program Manager left the Company. Even though Kumar reported directly to the Program Manager, Defendants did not inform Kumar of his departure until after he had left. The Global Head of Delivery then assumed responsibility for supervising Kumar.

99.     In late 2019 and early 2020, ElectrifAi executives made it clear to Kumar that they had effectively removed her as government practice lead and account manager and stripped her of additional strategic responsibilities. Scott directed IT to revoke Kumar's access to ElectrifAi's account management system that she used to track all current and future leads and sales. Scott transferred all existing accounts and relationships Kumar had developed and was tracking to another newly hired SVP, Hurst, without informing Kumar. Hurst is a White man. Hurst proceeded to reach out to Kumar's contacts without including her.

Defendants Continue Their and Discrimination and Retaliation After Kumar's EEOC Complaint

100.    On or about January 15, 2020, Kumar filed a charge of discrimination and retaliation with the EEOC. ElectrifAi escalated its discrimination and retaliation against Kumar.

101.    For example, defendants largely excluded Kumar from the recompete process for the CMS-HHS contract despite her role as SVP and primary CMS client contact and Kumar's previous success winning government contracts with HHS-CMS. By doing so, Defendants continued their pattern of removing Kumar's key job responsibilities.

102.    Despite Kumar's years of experience handling HHS-CMS contracts, Defendants failed to give Kumar material information about the recompete. For example, in early February 2020, HHS-CMS reclassified the contract from large business to small business under the applicable government rules. ElectrifAi does not qualify as a small business and thus needed to partner with another company.  Defendants did not include Kumar in the process of selecting a partner and refused to disclose the partner that the Company had chosen for several months despite Kumar's multiple requests.

103.    When Defendants asked for Kumar's assistance, the Company made unreasonable demands and further undermined Kumar's leadership.

104.    For example, on February 28, 2020, a Friday, Hornberger sent an email to Kumar and two of her direct reports with a list of questions related to the HHS-CMS RFP and asked for answers by noon the following Monday, March 2, 2020. Both team members other than Kumar replied to Hornberger expressing their confusion at being included. One CMS Team member replied, "You do know that Aparna [Kumar] could answer most, if not all, of these questions, correct?" Kumar responded that by asking for her input with less than one business day to complete the assignment, ElectrifAi executives had put her in an "impossible situation." She

stated that Hornberger's failure to disclose ElectrifAi's small business partner made it difficult for her to prepare a comprehensive response. Hornberger continued to refuse to disclose the name of the small business partner.

105.    Kumar complained to HR about the request and stated that she believed the actions constituted additional discrimination and retaliation. HR staff acknowledged Kumar's complaint on March 2, 2020 but provided no other response and took no remedial action.

106.    This happened throughout the recompete process. On April 7, 2020, Hornberger finally revealed the identity of the small business contractor ElectrifAi was partnering with on the bid for the recompete. The same day, Hornberger asked Kumar to complete the technical response to the RFP, giving a deadline of the following day, April 8, 2020. Kumar expressed concern that the Company had asked her to provide input in such a short period of time. Kumar identified several inaccuracies in the RFP response that the Company had prepared without her input and expressed dismay at her exclusion from the process.

107.    Also, in 2020, Defendants removed from its internal system Kumar as the "owner" of the CMS contract and replaced her with Hurst, a White, male SVP.

108.    Though the commission-based component of Kumar's pay had been cut in January 2019, in January 2020 ElectrifAi announced a new policy that all employees were eligible for commissions for bringing in new business. Yet the Company has not paid Kumar for any earned commissions.

109.    During the summer of 2020, Kumar learned that Defendants had removed her as Account Manager for the HHS-CMS account, a position she held since 2016.  Defendants announced that a White employee, Margaret Cox, Vice President, would serve as Account

Manager of the HHS-CMS account and that Kumar would be the Daily Project Manager for the account.

110.    No one informed Kumar of any change in her reporting structure. Cox holds the title of Vice President of Delivery.  Cox has assumed management responsibilities over Kumar even though Kumar's title is purportedly Senior Vice President and Cox has the title of Vice President.

111.    Defendants continue to discriminate and retaliate against Kumar.

## FIRST CAUSE OF ACTION

### Title VII Race, National Origin, and Sex Discrimination Against Corporate Defendants

112.    Plaintiff repeats and realleges paragraphs 1 through 111 of this Complaint as if fully set forth herein.

113.    Corporate Defendants have discriminated against plaintiff in the terms and conditions of her employment based on her race, national origin, and sex in violation of Title VII.

114.    Defendant ElectrifAi is liable under Title VII as plaintiff's employer.

115.    Defendant White Oak is liable under the Title VII as plaintiff's employer.

116.    Corporate Defendants have acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

117.    As a result of Corporate Defendants' discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

SECOND CAUSE OF ACTION

42 U.S.C. § 1981 Race Discrimination Against All Defendants

118.    Plaintiff repeats and realleges paragraphs 1 through 117 of this Complaint as if fully set forth herein.

119.    By the acts and practices described above, Defendants have discriminated against plaintiff on the basis of race in violation of Section 1981.

120.    Defendants have acted intentionally and with malice or reckless indifference to plaintiff's statutorily protected rights.

121.    As a result of Defendants' discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

THIRD CAUSE OF ACTION

NJLAD National Origin, Sex, and Race Discrimination Against All Defendants

122.    Plaintiff repeats and realleges paragraphs 1 through 121 of this Complaint as if fully set forth herein.

123.    By the acts and practices described above, Defendants have discriminated against plaintiff on the basis of her race, national origin, and sex in violation of the NJLAD.

124.    Defendant ElectrifAi is liable under NJLAD as plaintiff's employer.

125.    Defendant White Oak is liable under NJLAD as plaintiff's employer and/or as an aider and abettor of the discrimination against plaintiff.

126.    Defendant Scott is liable under NJLAD as plaintiff's employer and/or as an aider and abettor of the discrimination against plaintiff.

127.    Defendant Hornberger is liable under NJLAD as an aider and abettor of the discrimination against plaintiff.

128.    Defendants have actually participated in and/or acted with negligence and willful indifference to plaintiff's statutorily protected rights.

129.    As a result of Defendants' discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

130.    In addition, plaintiff is entitled to punitive damages and other remedies as may be appropriate under NJLAD.

<u>FOURTH CAUSE OF ACTION</u>

<u>NYSHRL National Origin, Race, and Gender Discrimination Against All Defendants</u>

131.    Plaintiff repeats and realleges paragraphs 1 through 130 of this Complaint as if fully set forth herein.

132.    By the acts and practices described above, all Defendants have discriminated against plaintiff on the basis of her race, national origin, and sex in violation of the NYSHRL.

133.    Defendant ElectrifAi is liable under the NYSHRL as plaintiff's employer.

134.    Defendant White Oak is liable under the NYSHRL as plaintiff's employer and/or as an aider and abettor of the discrimination against plaintiff.

135.    Defendant Scott is liable under the NYSHRL as plaintiff's employer and/or as an aider and abettor of the discrimination against plaintiff.

136.    Defendant Hornberger is liable under the NYSHRL as an aider and abettor of the discrimination against plaintiff.

137.    As a result of Defendants' discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

138.    Defendants have acted intentionally and with malice or reckless indifference to plaintiff's statutorily protected rights.

<u>FIFTH CAUSE OF ACTION</u>

<u>NYCHRL National Origin, Race, and Gender Discrimination Against All Defendants</u>

139.    Plaintiff repeats and realleges paragraphs 1 through 138 of this Complaint as if fully set forth herein.

140.    By the acts and practices described above, all Defendants discriminated against plaintiff on the basis of her race, national origin, and sex in violation of the NYCHRL.

141.    Defendant ElectrifAi is liable under the NYCHRL as plaintiff's employer.

142.    Defendant White Oak is liable under the NYCHRL as plaintiff's employer and/or as an aider and abettor of the discrimination against plaintiff.

143.    Defendant Scott is liable under the NYCHRL as plaintiff's employer and/or as an aider and abettor of the discrimination against plaintiff.

144.    Defendant Hornberger is liable under the NYCHRL as an aider and abettor of the discrimination against plaintiff.

145.    As a result of Defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

146.    In addition, plaintiff is entitled to punitive damages and other remedies as may be appropriate under the NYCHRL.

SIXTH CAUSE OF ACTION

Title VII Retaliation Against Corporate Defendants

147.    Plaintiff repeats and realleges paragraphs 1 through 146 of this Complaint as if fully set forth herein.

148.    Corporate Defendants retaliated against plaintiff for her protected complaints and opposition to unlawful employment practices in violation of Title VII.

149.    Defendant ElectrifAi is liable under Title VII as plaintiff's employer.

150.    Defendant White Oak is liable under the Title VII as plaintiff's employer.

151.    Corporate Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

152.    As a result of Corporate Defendants' retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

SEVENTH CAUSE OF ACTION

42 U.S.C. § 1981 Retaliation Against All Defendants

153.    Plaintiff repeats and realleges paragraphs 1 through 152 of this Complaint as if fully set forth herein.

36

154.    By the acts and practices described above, Defendants have retaliated against plaintiff in violation of Section 1981 for her protected activity.

155.    Defendants have acted intentionally and with malice or reckless indifference to plaintiff's statutorily protected rights.

156.    As a result of Defendants' retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

<u>EIGHTH CAUSE OF ACTION</u>

<u>NJLAD Retaliation Against All Defendants</u>

157.    Plaintiff repeats and realleges paragraphs 1 through 156 of this Complaint as if fully set forth herein.

158.    By the acts and practices described above, Defendants have retaliated against plaintiff in violation of the NJLAD for her protected activity and for opposing practices prohibited by the NJLAD.

159.    Defendant ElectrifAi is liable under NJLAD as plaintiff's employer.

160.    Defendant White Oak is liable under NJLAD as plaintiff's employer and/or as an aider and abettor of the retaliation against plaintiff.

161.    Defendant Scott is liable under NJLAD as plaintiff's employer and/or as an aider and abettor of the retaliation against plaintiff.

162.    Defendant Hornberger is liable under NJLAD as an aider and abettor of the retaliation against plaintiff.

163.    Defendants have actually participated in and acted with negligence and willful indifference to plaintiff's statutorily protected rights.

164.    As a result of Defendants' retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

165.    In addition, plaintiff is entitled to punitive damages and other remedies as may be appropriate under the NJLAD.

<u>NINTH CAUSE OF ACTION</u>

<u>NYSHRL Retaliation Against All Defendants</u>

166.    Plaintiff repeats and realleges paragraphs 1 through 165 of this Complaint as if fully set forth herein.

167.    By acts and practices described above, Defendants have retaliated against plaintiff for her protected activity and for opposing practices prohibited by NYSHRL.

168.    Defendant ElectrifAi is liable under the NYSHRL as plaintiff's employer.

169.    Defendant White Oak is liable under the NYSHRL as plaintiff's employer and/or as an aider and abettor of the retaliation against plaintiff.

170.    Defendant Scott is liable under the NYSHRL as plaintiff's employer and/or as an aider and abettor of the retaliation against plaintiff.

171.    Defendant Hornberger is liable under the NYSHRL as an aider and abettor of the retaliation against plaintiff.

172.    As a result of Defendants' retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish,

emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

173.    Defendants have acted intentionally and with malice or reckless indifference to plaintiff's statutorily protected rights.

TENTH CAUSE OF ACTION

NYCHRL Retaliation Against All Defendants

174.    Plaintiff repeats and realleges paragraphs 1 through 173 of this Complaint as if fully set forth herein.

175.    By acts and practices described above, Defendants have retaliated against plaintiff for her protected activity and for opposing practices prohibited by NYCHRL.

176.    Defendant ElectrifAi is liable under the NYCHRL as plaintiff's employer.

177.    Defendant White Oak is liable under the NYCHRL as plaintiff's employer and/or as an aider and abettor of the retaliation against plaintiff.

178.    Defendant Scott is liable under the NYCHRL as plaintiff's employer and/or as an aider and abettor of the retaliation against plaintiff.

179.    Defendant Hornberger is liable under the NYCHRL as an aider and abettor of the retaliation against plaintiff.

180.    As a result of Defendants' retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer economic losses, irreparable injury, emotional distress, and other compensable damages, unless and until this Court grants relief.

181.    Defendants have acted intentionally and with malice or reckless indifference to plaintiff's statutorily protected rights.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

    a.   Declaring that the acts and practices complained of herein violate Title VII, Section 1981 and the NJLAD, NYSHRL, and NYCHRL;

    b.   Enjoining and permanently restraining these violations of Title VII, Section 1981 and the NJLAD, NYSHRL, and NYCHRL;

    c.   Directing Defendants to take affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff;

    d.   Directing Defendants to place plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment, and making her whole for all the earnings and benefits she would have received but for Defendants' discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, and other lost benefits;

    e.   Directing Defendants to pay plaintiff compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering;

    f.   Directing Defendants to pay plaintiff punitive damages as provided by Title VII, Section 1981 and the NJLAD, NYSHRL, and NYCHRL;

    g.   Awarding plaintiff reasonable attorneys' fees and costs;

    h.   Awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

i.   Granting plaintiff a tax enhancement award to offset adverse tax consequences associated with a lump sum award of damages; and

j.   Granting such other and further relief as the Court deems necessary and proper.

<u>DEMAND FOR A TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated:      New York, New York
            August 24, 2020

                                    VLADECK, RASKIN, & CLARK, P.C.

                            By:   */s/ Jeremiah Iadevaia*
                                  _____
                                  Jeremiah Iadevaia
                                  Kathleen C. Riley (admission pending)
                                  Attorneys for Plaintiff
                                  565 Fifth Avenue, 9th Floor
                                  New York, New York 10017
                                  (212) 403-7300