UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

|  |  |
|---|---|
| APARNA KUMAR, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| -against- | : |
|  | : |
| OPERA SOLUTIONS OPCO, LLC d/b/a | : |
| ELECTRIFAI; OPERA SOLUTIONS | : |
| INTERMEDIATE, LLC; OPERA SOLUTIONS | : |
| HOLDING, LLC; OPERA SOLUTIONS USA, LLC; | : |
| ELECTRIFAI, LLC; WHITE OAK FINANCIAL, | : |
| LLC; WHITE OAK GLOBAL ADVISORS LLC; | : |
| EDWARD SCOTT; and NANCY HORNBERGER, | : |
|  | : |
| Defendants. | : |
|  | : |

---------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/28/2021

1:20-cv-6824-GHW

MEMORANDUM OPNION
AND ORDER

GREGORY H. WOODS, District Judge:

Plaintiff Aparna Kumar worked for eleven years at ElectrifAi, a New Jersey-based company. During her tenure, Ms. Kumar did much of her work from her homes in Ithaca and Manhattan, New York. While Ms. Kumar was at the company, Defendant Edward Scott became CEO of ElectrifAi. Ms. Kumar alleges that he, defendant Nancy Hornberger, and her employer (including its related corporate entities) engaged in a campaign of discrimination and retaliation, which ultimately ended in Ms. Kumar's termination from the company. Ms. Kumar brought this action as a result, raising claims under Title VII, the New York State Human Rights Law, the New York City Human Rights Law, and the New Jersey Law Against Discrimination.

The individual defendants, Mr. Scott and Ms. Hornberger, have moved to dismiss the action against them for lack of personal jurisdiction. All defendants have moved to dismiss for improper venue or, in the alternative, to transfer the action to the District of New Jersey. Because Mr. Scott and Ms. Hornberger transacted business in New York under New York's long-arm statute, and

because the exercise of personal jurisdiction comports with due process, the court may exercise its personal jurisdiction over Mr. Scott and Ms. Hornberger.  Therefore, Mr. Scott's and Ms. Hornbergers's motions to dismiss for lack of personal jurisdiction are DENIED.  In addition, venue is proper in the Southern District of New York, and the Court declines to exercise its discretion to transfer this case to the District of New Jersey.  Defendants' motion to dismiss or transfer because of improper venue is also DENIED.

## I.     BACKGROUND

### a.   Factual Background

#### 1)  Ms. Kumar's Employment with ElectrifAi

Ms. Kumar is an Indian-American woman.  Dkt. No. 54, Second Amended Complaint ("SAC") ¶ 25.  She is a resident of New York State; she splits her time between her homes in Manhattan and Ithaca.  *Id.* ¶ 31.  She began working for Defendant ElectrifAi (the "Company"), then known as Opera Solutions, in 2008 as an intern while pursuing her MBA.  *Id.* ¶¶ 60–61.  Since 2012, Ms. Kumar has worked remotely for long periods of time.  Dkt. No. 70, Declaration of Aparna Kumar ("Kumar Decl.") ¶¶ 8–16.  From May 2012 through March 2016, Ms. Kumar worked primarily from her home in Washington, D.C.  SAC ¶ 30.  Ms. Kumar continued to work from home after she moved to New York, spending approximately half the year in Ithaca, and the majority of the other half working from home in Manhattan, occasionally going into her employer's New Jersey office.  *Id.* ¶ 31.  At the time she was fired, ElectrifAi's internal system designated Ms. Kumar as a New York-based employee.  Kumar Decl. ¶ 15. Dkt. No. 70-2, Exhibit B to Kumar Decl. ("Kumar Decl. Ex. B").  She currently collects unemployment benefits from the New York State Department of Labor.  Kumar Decl. ¶ 18.

Starting in 2012, Ms. Kumar worked on an account with the Maryland-based Centers for Medicare and Medicaid Services ("CMS"), ElectrifAi's largest client.  SAC ¶¶ 1, 47, 65, 69.  Before

she worked on the CMS team full-time, Ms. Kumar worked with New York-based clients, visiting them at their offices.  Kumar Decl. ¶ 23.  Ms. Kumar received a series of promotions during her time at the Company, ultimately reaching a position as Account Manager for the CMS account.  *Id.* ¶¶ 1, 64.  In that role, Ms. Kumar oversaw a team of over 34 employees, many of whom also worked primarily from their homes in states other than New Jersey.  *Id.* ¶¶ 1, 37.

### 2)  Corporate and Individual Defendants

The Company is a limited liability company formed under Delaware law with its headquarters in New Jersey, as are its related entities, Defendants Opera Solutions Holding, LLC; Opera Solutions Intermediate, LLC; Opera Solutions, LLC; Opera Solutions USA, LLC; and ElectrifAi, LLC.  SAC ¶ 11.  The Company provides business intelligence services.  *Id.* ¶ 42.  It was once headquartered in New York but moved to New Jersey in 2014 or 2015.  *Id.* ¶ 43.  The Company maintained offices in Manhattan until 2019.  *Id.*  The Company is registered to transact business in New York and has employees based in locations other than New Jersey, including in New York.  *Id.* ¶¶ 44–45.

Defendants White Oak Financial, LLC and White Oak Global Advisors, LLC (together, "White Oak") are limited liability corporations formed under Delaware law with headquarters in San Francisco, California and offices in New York County.  *Id.* ¶ 12.  White Oak ultimately owns Opera and ElectrifAi.  White Oak Global Advisors is an investment advisor and alternative investment fund that is registered to transact business in New York and actively conducts business in New York, where about one-third of its employees work.  *Id.* ¶¶ 39–41.

Defendant Edward Scott, a Connecticut resident, is currently the CEO of the Company.  *Id.* ¶ 13.  When he became CEO, Mr. Scott served as Ms. Kumar's direct supervisor.  *Id.* ¶ 53.  Before assuming his position at the Company, Mr. Scott worked in the New York offices of White Oak Global Advisors as a partner and a managing director.  *Id.* ¶ 49.  He became CEO of ElectrifAi in

3

October 2018 and also retained his position as a managing director of White Oak Global Advisors until approximately March 2020. *Id.* ¶ 50.

Defendant Nancy Hornberger, a California resident, is the Executive Vice President for Revenue and Healthcare at ElectrifAi. *Id.* ¶ 54. From September 2019 to September 2020, Ms. Hornberger served both as Ms. Kumar's direct and indirect supervisor. *Id.* She oversaw Ms. Kumar's work and frequently communicated with Ms. Kumar over the phone and by email when Ms. Kumar was working from New York. *Id.* Ms. Kumar alleges that Ms. Hornberger initiated or participated in discrimination and retaliation against Ms. Kumar. *Id.*

### 3) Defendants' Alleged Discriminatory Conduct

#### 1. Mr. Scott's Alleged Discrimination Towards Immigrants, Racial Minorities, and Women

Ms. Kumar alleges that during his tenure as CEO, Mr. Scott harbored biases and acted in a discriminatory manner towards immigrants, racial minorities, and women, including by making racist and sexist comments in the office. She alleges that Mr. Scott displayed a bias towards employees of Asian descent, calling Indian employees "dirty" and stating that it was a "relief" to learn that Ms. Kumar was from New York and not India. *Id.* ¶¶ 75, 80. On many occasions, Mr. Scott threatened and stereotyped Indian employees. *Id.* ¶¶ 81–83. He used anti-Chinese slurs on many occasions, when discussing both clients and employees. *Id.* ¶¶ 76–77. Scott also displayed anti-Black bias, using disparaging language when discussing the firing of a Black employee. *Id.* ¶ 79.

Mr. Scott also discriminated against women. Ms. Kumar alleges that Mr. Scott made inappropriate comments to female interns and employees, excluded women from work-related social events, and fired women who he believed to have complained about him. *Id.* ¶¶ 85–88.

### 2. Defendants' Alleged Discriminatory Conduct Against Ms. Kumar

Beginning in December 2018, Mr. Scott repeatedly threatened to fire or replace Ms. Kumar, and encouraged her to quit. *Id.* ¶¶ 90–91. Mr. Scott downplayed Ms. Kumar's accomplishments, particularly by sending a muted email in response to news that she had added new revenue to her account. *Id.* ¶ 92. Mr. Scott would celebrate loudly through the halls of the Company's offices when other employees experienced similar successes. *Id.*

One of the first flashpoints between Ms. Kumar and Mr. Scott arose in September 2019, when Mr. Scott attempted to replace Ms. Kumar as the manager of the CMS account. *Id.* ¶ 94. In a meeting on September 3, 2019, Mr. Scott yelled at Ms. Kumar in front of other employees, accusing her of cutting her team off from the rest of the company. *Id.* On September 10, 2019, Mr. Scott held a meeting in ElectrifAi's Jersey City headquarters with all members of the CMS team, including those who worked remotely, out-of-state. *Id.* Ms. Kumar believed the purpose of the meeting was to introduce Ms. Hornberger and David Smith as Ms. Kumar's replacements. *Id.* ¶ 95. During the meeting, Mr. Scott glared at Ms. Kumar and attempted to solicit Ms. Kumar's team members for negative feedback about her. *Id.* Ms. Hornberger and Mr. Smith were not officially introduced as Ms. Kumar's replacement at the meeting. The next day, Mr. Scott held another meeting between himself, Ms. Kumar, Ms. Hornberger, Mr. Smith, and another senior employee. *Id.* ¶ 96. In that meeting, Mr. Scott threatened to demote Ms. Kumar, encouraged her to quit on the spot, and threatened to have her role filled by Ms. Hornberger and Mr. Smith instead. *Id.* ¶¶ 96–97. A few days after this meeting, Mr. Scott told Ms. Kumar's deputy that he intended to fire Ms. Kumar. *Id.* ¶ 98. But Ms. Kumar's deputy warned Mr. Scott not to fire Ms. Kumar, expressing concern that the CMS team would lose the account if Ms. Kumar were not there to recompete for the contract in 2020. *Id.*

While they did not fire her, Defendants began to strip Ms. Kumar of some of her responsibilities and compensation. First, Mr. Scott revoked Ms. Kumar's authority to make hiring decisions for the CMS team, ordering her to defer instead the Head of Talent for ElectrifAi. *Id.* ¶ 103. In Fall 2018, the team experienced a high rate of attrition, and Mr. Scott sought to blame Ms. Kumar for the resignations by directing HR to ask resigning employees about her during their exit interviews. *Id.* ¶ 99. On October 4, 2019, Ms. Kumar received a surprising email while working from her home in New York—Ms. Hornberger and Mr. Smith would run the company's healthcare vertical and serve as Ms. Kumar's direct supervisors. *Id.* ¶ 104. Later, she was told that she would continue as the "Program Manager" for the CMS account. *Id.* Mr. Scott again blamed Ms. Kumar for the resignations in an October 15, 2019 meeting, berating her in front of Ms. Hornberger, Mr. Smith and others, using expletives and calling her a "disgrace" using language in a tone that Mr. Scott did not use when speaking to white, male managers. *Id.* ¶ 106. The next day, while working from home in New York, Ms. Kumar sent an email to Mr. Scott informing him that she felt hurt and embarrassed by the way had spoken to her at the October 15 meeting. *Id.* ¶ 107. In response, Mr. Scott added additional senior employees to the email chain and wrote to her that she had a "pattern of negative behavior" that is "antithetical to [ElectrifAi's] values and culture." *Id.* ¶ 108.

During this same period, CMS expressed a high level of satisfaction with Ms. Kumar's work. *Id.* ¶¶ 101–02, 109. On September 18, 2019, another meeting was held, with Ms. Kumar, Mr. Scott, Ms. Hornberger, Mr. Smith, and the client representatives from CMS in attendance. *Id.* ¶ 101. At this meeting, the CMS client representatives praised Ms. Kumar's performance as the leader of her team. *Id.* After the meeting, Mr. Scott agreed that Ms. Kumar was a good manager and told her that he would find additional projects for her to manage, mischaracterizing her role as a project manager rather than an account manager, which is a more prestigious role. *Id.* ¶ 102.

### 4) Ms. Kumar's Complaint to HR at White Oak Global Advisors

In June 2019, Mr. Scott fired ElectrifAi's head of human resources.  Soon afterward, the remaining two employees in the Company's human resources department also resigned.  *Id.* ¶ 113.  At this point, the Company no longer had an HR team, and Mr. Scott appointed himself and ElectrifAi's general counsel to serve as the company's HR officers.  *Id.* ¶ 114.  Mr. Scott directed that all HR complaints go to him, joked about the lack of an official HR department, and placed a white board next to his desk on which employees were directed to write their HR complaints.  *Id.*  Because Ms. Kumar was concerned about the possibility of retaliatory firing for making a complaint at the Company, she and three of her employees went to the HR department of White Oak Global Advisors on October 16, 2019 to make a complaint against Mr. Scott.  *Id.* ¶¶ 114–15; 117.  In New York, Ms. Kumar spoke with an administrative assistant.  *Id.* ¶ 118.  The next day, Ms. Kumar received a call from Pamela Hart, Global Head of Human Resources for White Oak Global Advisors.  *Id.*  Ms. Hart told Ms. Kumar that she would investigate these allegations, and she connected Ms. Kumar to the attorney-investigator that White Oak had already hired to investigate other claims against Mr. Scott.  *Id.*  Ms. Kumar met with the attorney-investigator for many hours on October 22, 2019.  *Id.* ¶ 120.  The investigation into Ms. Kumar's complaints concluded in approximately January 2020.  White Oak Global Advisors decided not to remove Mr. Scott from his position as CEO of ElectrifAi in the wake of the investigation.  *Id.* ¶ 121.

### 5) Defendants' Retaliation in Response to Ms. Kumar's Complaint

Following Ms. Kumar's complaint to White Oak's HR Department and the ensuing investigation, Defendants collectively are alleged to have removed her from her position on the Company's Management Committee and revoked her profit and loss responsibilities for ElectrifAi's government practice group.  *Id.* ¶¶ 122–24.  Defendants, including Ms. Hornberger and Mr. Scott, demoted Ms. Kumar by placing additional levels of management between Ms. Kumar and Mr. Scott,

her former direct supervisor. *Id.* ¶ 130.  On October 29, 2019, Defendants hired a "Program Director" to directly oversee Ms. Kumar. *Id.*  Around November 5, 2019, Ms. Hornberger sent an email to Ms. Kumar mandating that she submit multiple daily reports to her Program Director. *Id.* ¶ 131; Dkt. No. 66-2, Exhibit B to Declaration of Robert J. Malionek.  Ms. Kumar was the only employee who had to submit such daily reports, and she worried that it would interfere with the completion of her regular work.  SAC ¶ 131.  In early December 2019, ElectrifAi placed another manager above Ms. Kumar on the CMS team, an individual who held the title of Global Head of Delivery. *Id.* ¶ 135.  The Global Head of Delivery held weekly meetings with CMS, only including Ms. Kumar after the client requested her participation. *Id.*  In late 2019 and early 2020, Ms. Hornberger and Mr. Scott directed IT to take away Ms. Kumar's access to ElectrifAi's account management system and to transfer access to Deron Hurst—a new senior vice president, who is white—without Ms. Kumar's knowledge. *Id.* ¶ 137.

In response to the harassment she faced there, Ms. Kumar did not return to the Company's New Jersey offices after October 16, 2019. *Id.* ¶ 125.  On October 23, 2019, Ms. Hornberger emailed Ms. Kumar to ask why she was not coming into the Jersey City office. *Id.* ¶ 126; Dkt. No. 66-1, Exhibit A to the Declaration of Robert J. Malionek ("Malionek Decl., Ex. A").  For the next week, Ms. Hornberger insisted that Ms. Kumar work in the New Jersey office.  SAC ¶ 126.  On October 30, 2019, Ms. Kumar emailed Julia Rozario, the newly hired HR manager for ElectrifAi, stating that she would not be coming into the office due to the discrimination and harassment that she faced there, and that she would like White Oak to resolve the issues she raised in her complaint before returning to the office.  SAC ¶ 127.  Ms. Kumar also emailed Ms. Hornberger, informing her of the complaint and that she would be working from home in New York until the issues surrounding the discrimination and harassment were resolved. *Id.* ¶ 128; Malionek Decl., Ex. A. Although Ms. Hornberger initially insisted that Ms. Kumar return to the office, Ms. Kumar

reassured Ms. Hornberger that she was able to complete her work from home, so Defendants, including Mr. Scott and Ms. Hornberger then allowed her to work remotely.  SAC ¶ 128.[1]  From October 2019 to September 2020, Hornberger asked Ms. Kumar to come into the office only once, for a meeting that was later cancelled.  *Id.* ¶ 128.  In approximately June 2020, the Company asked Ms. Kumar to return its data.  *Id.* ¶ 158.  Six weeks later, at Ms. Kumar's request, the Company then provided Ms. Kumar with a laptop from which she could work from home.  *Id.* ¶ 159.

### 6)  Ms. Kumar Files EEOC Complaint

On or about January 15, 2020, Ms. Kumar filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission (the "EEOC").  *Id.* ¶¶ 138–40.  Defendants, including Mr. Scott and Ms. Hornberger, then allegedly retaliated against Ms. Kumar by effectively shutting her out of the recompete process on the CMS account; and they only consulted with Ms. Kumar to ask complex questions on tight deadlines that she considered impossible to meet.  *Id.* ¶¶ 141–42, 144.  Ms. Kumar complained to "HR" via email when she received such a request.  *Id.* ¶ 141.  HR acknowledged receipt of the email but did not take any additional action.  *Id.* Defendants, including Mr. Scott, then transferred ownership of the CMS account in the Company's internal computing system from Ms. Kumar to Mr. Hurst.  *Id.* ¶ 137.  And although it was the Company's practice to award commissions, Ms. Kumar did not receive any additional compensation when her team was successful in its recompete for the CMS contract.  *Id.* ¶ 146.

After the recompete process was over, in approximately July 2020, Ms. Kumar raised her concerns on a call with Ms. Hornberger and other Company managers.  During the call, Ms. Hornberger cut Ms. Kumar off and began yelling at her with the other participants still on the line in

---

[1] When Mr. Scott became CEO, the Company attempted to call more of its remote employees back into the New Jersey office.  *See* Docket Nos. 62-B, 62-C, Exhibits B and C to the Declaration of Joseph D. Guarino.  Ms. Kumar asserts that any new policy on attendance was not enforced against her and that the CMS team was not subject to this attendance policy.  Kumar Decl. ¶¶ 41–42.

a manner Ms. Kumar alleges that she did not speak to male or non-Indian employees.  *Id.*  ¶ 147.
Following this call, Ms. Hornberger called a July 24 meeting.  Ms. Kumar attended the meeting
remotely from New York.  During the meeting, Ms. Hornberger stated that Ms. Kumar would no
longer be the account manager on the CMS account.  *Id.* ¶ 148.  Margaret Cox, Vice President—a
white woman—was announced as Ms. Kumar's replacement at that meeting.  *Id.*  Ms. Kumar was
given a new title of  Daily Project Manager.  *Id.*  Following this change, it was unclear to Ms. Kumar
if there had been a change in the reporting structure—Ms. Kumar was technically still a Senior Vice
President and Ms. Cox only a Vice President.  *Id.* ¶ 149.  Still, Ms. Cox checked in frequently with
Ms. Kumar while she worked remotely in New York by both phone and email.  *Id.*  At Mr. Scott and
Ms. Hornberger's direction, Ms. Cox "accused Kumar of numerous performance deficiencies in
several emails" that Ms. Kumar considered baseless and retaliatory.  *Id.*

Ms. Kumar filed this lawsuit on August 24, 2020.  *Id.* ¶ 154.

### 7)  Ms. Kumar is Fired

On September 15, 2020, Ms. Kumar learned from the Company's HR department that she
would be fired in two weeks, effective September 29, 2020.  SAC ¶ 150; Dkt. No. 70-1, Exhibit A to
the Declaration of Aparna Kumar.  Defendants, including Mr. Scott and Ms. Hornberger, made the
decision to fire Ms. Kumar.  SAC ¶ 150.  The Company told Ms. Kumar that the reason for her
termination was that her position was being eliminated.  *Id.* ¶ 151.  When Ms. Kumar attempted to
find employment working with the Company's small business partner on the same account, the
small business partner declined to hire Ms. Kumar because ElectrifAi would not waive the non-
compete provision of her Employee Non-Disclosure, Proprietary Rights, and Non-Competition
Agreement (the "NDA").  *Id.* ¶ 153; Dkt. No. 54-1.

On November 20, 2020, after Ms. Kumar had been fired, the Company—at Mr. Scott's
direction—filed a lawsuit in New Jersey against Ms. Kumar, asserting that Ms. Kumar had breached

provisions of the NDA.  SAC ¶¶ 155–157, 164; Dkt. Nos. 54-2, 54-3, Exhibits B and C to SAC. The lawsuit was dismissed on December 22, 2020, when the New Jersey court determined that a forum selection clause in the NDA barred the action from proceeding in New Jersey.  SAC ¶ 166. ElectrifAi filed a third-party complaint against Ms. Kumar on December 4, 2020, also in New Jersey, alleging that Ms. Kumar breached her common law duty of loyalty and interfered with prospective economic advantage.  *Id.* ¶¶ 170–71.  Mr. Scott also directed the Company to file this suit against Ms. Kumar.  *Id.* ¶ 176.

### b. Procedural History

On August 17 and 18, 2020, Ms. Kumar received letters from the EEOC informing her of her right to sue.  SAC ¶ 23; Dkt. No. 62–1, Exhibit A to the Declaration of Joseph D. Guarino.  On August 24, 2020, Ms. Kumar initiated this case.  Dkt. No. 1.  Ms. Kumar amended her complaint on November 23, 2020.  Dkt. No. 39.  On December 21, 2020, Mr. Scott moved to dismiss for lack of jurisdiction, Dkt. No. 44, Ms. Hornberger moved to dismiss for lack of personal jurisdiction, Dkt. No. 49, and all Defendants moved to dismiss or transfer venue, Dkt. No. 49.  In response, Ms. Kumar amended her complaint a second time.  Dkt. No. 54.  Accordingly, Defendants' motions were dismissed as moot on January 13, 2021.

Defendants moved to dismiss the Second Amended Complaint on January 29, 2021.  Mr. Scott moved to dismiss for lack of jurisdiction.  Def.'s Br. Supp. Mot. to Dismiss ("Scott Br."), Dkt. No. 59.  Defendant Hornberger also moved to dismiss for lack of personal jurisdiction.  Def.'s Br. Supp. Mot. to Dismiss ("Hornberger Br."), Dkt. No. 65.  All Defendants filed a motion to dismiss or transfer venue.  Defs.' Br. Supp. Mot. to Dismiss (Defs.' Br.), Dkt. No. 60.  Ms. Kumar opposed Mr. Scott and Ms. Hornberger's motion, Mem Law in Opp'n to Defs.' Mot. to Dismiss Pl.'s Second Am. Compl. ("Opp'n"), as well as Defendants' motion to transfer. Pls. Memorandum of Law in Opp'n to Defendants' Motion to Dismiss or Transfer ("Transfer Opp'n), Dkt. No. 68.  Defendants

replied.  Defendant Scott filed his reply on March 1, 2021.  Def.'s Reply Br. Further Supp. Mot. to

Dismiss ("Scott Reply"), Dkt. No. 72.  Defendant Hornberger filed her reply on March 2, 2021.

Def.'s Reply Br. Further Supp. Mot. to Dismiss ("Hornberger Reply"), Dkt. No. 73.  All defendants

also replied, on the issue of venue, to Ms. Kumar's opposition on March 2, 2021, Defs.' Reply Br.

Further Supp. Mot. to Dismiss ("Defs.' Reply"), Dkt. No. 74.  Ms. Kumar then responded on March

15, 2021.  Pl.'s Resp. in Opp'n to Defs.' Reply Brs. Further Supp. Mot. to Dismiss ("Pl.s' Surreply"),

Dkt. No. 79.

## II.    Mr. Scott's and Ms. Hornberger's Motions to Dismiss for Lack of Personal Jurisdiction

### a.  Legal Standard

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity

against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir.

2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir.2003) (per curiam)).

To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "varies depending on the

procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d

Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  At the

pleading stage—and before discovery—a plaintiff need make only a prima facie showing that

jurisdiction exists.  *See id.* at 84–85; *see also Eades v. Kennedy, PC L. Offs.*, 799 F.3d 161, 167–68 (2d Cir.

2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must

make a *prima facie* showing that jurisdiction exists.") (quoting *Licci ex rel. Licci v. Lebanese Canadian

Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)).

Courts may rely on materials outside the pleadings in considering a motion to dismiss for

lack of personal jurisdiction.  *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).  If a

court considers only pleadings and affidavits, the plaintiff's prima facie showing "must include an

averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction

over the defendant." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).  The allegations in the complaint must be taken "as true 'to the extent they are uncontroverted' by the defendant's affidavits, 'which the district court may also consider.'"  *NuMSP, LLC v. St. Etienne*, 462 F. Supp. 3d 330, 341 (S.D.N.Y. 2020) (quoting *GlaxoSmithKline LLC v. Laclede, Inc.*, No. 18-cv-4945, 2019 WL 293329, at *3 (S.D.N.Y. Jan. 23, 2019) (citing in turn, *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012))).  But if the parties present conflicting affidavits, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) (citation omitted).  Courts will not, however, "draw argumentative inferences in plaintiff's favor . . . [or] accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (international quotation marks and citation omitted).

District courts "resolving issues of personal jurisdiction must . . .engage in a two-part analysis." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). "First, they must determine whether there is jurisdiction over the defendant under the relevant forum state's laws . . . .  Second, they must determine whether an exercise of jurisdiction under these laws is consistent with federal due process requirements." *Id.*  "To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks*, 714 F.3d at 673 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "To determine whether a defendant has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction." *Id.*  Courts "may assert general personal jurisdiction over a foreign defendant to hear any and all claims against that

defendant only when the defendant's affiliations with the State in which the suit is brought 'are so constant and pervasive so as to render it essentially at home in the forum State.'" *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)).  Specific jurisdiction, by contrast, "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

The New York State long-arm statute provides for general jurisdiction under section 301 of the New York Civil Practice Law and Rules (the "N.Y. C.P.L.R.").  *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000).  In addition to general jurisdiction, "[t]he New York long arm statute authorizes personal jurisdiction over non-domiciliary under [section 302(a)]." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001) (citing N.Y. C.P.L.R. § 302(a)).

Under Section 302(a), a court may exercise personal jurisdiction over a nondomiciliary, or his executor or administrator, who in person or through an agent

> (1) transacts any business within the state . . . ; or
> (2) commits a tortious act within the state . . . ; or
> (3) commits a tortious action without the state causing injury to a person or property within the state . . . if he
> > (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
> > (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenues from interstate or international commerce.

N.Y. C.P.L.R. § 302(a).

### b. Application

#### 1) The Court Has Personal Jurisdiction over Mr. Scott and Ms. Hornberger under N.Y. C.P.L.R. § 302(a)(1)

The Court may exercise specific personal jurisdiction over Mr. Scott and Ms. Hornberger under N.Y. C.P.L.R. § 302(a)(1) because the two "transact[ed] business within the state." "[C]ourts must examine the totality of the circumstances to determine whether activities within the state are sufficient to support personal jurisdiction" under Section 302(a)(1). *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 358 (S.D.N.Y. 2007). "Although it is impossible to precisely fix those acts that constitute a transaction of business, [New York] precedents establish that it is the quality of the defendants' New York contacts that is the primary consideration." *Williams v. Preeminent Protective Svcs., Inc.,* 81 F. Supp. 3d 265, 271 (E.D.N.Y. 2015) (quoting *Fischbarg v. Doucet*, 849 N.Y.S. 2d 501, 506 (2007)).

The "overriding criterion" necessary to establish a business transaction "is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York,' thereby 'invoking the benefits and protections of its laws.'" *Licci*, 673 F.3d at 61 (citations omitted). Determining purposeful availment for purposes of establishing a business transaction "is an objective inquiry." *Fica Frio, Ltd. v. Seinfeld*, 434 F. Supp. 3d 80, 87 (S.D.N.Y. 2020) (quoting *Al Rushaid v. Pictet & Cie*, 45 N.Y.S. 3d 276 (2016)).

In addition, "the cause of action [must] 'arise from' that business transaction or transactions." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 249 (2d Cir. 2007) (alteration in original) (citing *Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 818 N.Y.S.2d 164, 168 (2006)). "A cause of action arises out of a defendant's New York transactions when it is 'sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business.'" *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir. 1997) (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 59 (2d Cir.1985). In other words, to satisfy Section 302(a)(1)'s requirements, a

defendant's "[b]usiness transactions must entail purposeful activity in the state that bears a substantial nexus with the claim." *Int'l Healthcare Exch.*, 470 F. Supp. 2d at 358 (citing *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir. 1996)).

Section 302(a)(1) allows personal jurisdiction to be established over a non-domiciliary. "A non-domiciliary transacts business when on his or her own initiative . . . the non-domiciliary projects himself or herself into this state to engage in a sustained and substantial transaction of business." *Paterno v. Laser Spine Inst.*, 24 N.Y. 3d 370, 377 (2014) (internal quotation marks and brackets omitted). One way that a non-domiciliary can "project herself into this state" is through "technological methods that permit business transactions and communications"—such as phone calls and emails— "without the physical crossing of borders." *Id.*

In some employment discrimination cases, personal jurisdiction has been established under Section 302(a)(1) over out-of-state defendants who supervise or communicate with an employee working remotely from New York. Examples include cases where "[d]efendants hired [plaintiff] knowing that she would live and work in Brooklyn" and "continued their communications with plaintiff [t]here for a sustained period of time," *Williams*, 81 F. Supp. 3d at 271; an employer "provided a company laptop for [p]laintiff to use from her home in New York to conduct business on Defendant's behalf," *Winner v. Tryko Partners, LLC*, 333 F. Supp. 3d 250, 260 (W.D.N.Y. 2018); an out-of-state employer knew "that [the plaintiff] was unwilling to relocate from his home in New York" and "chose to allow him to work" there "for three-and-a-half years, during which time [defendants] frequently sent communications into and out of the state," *Manning v. Erhardt + Leimer, Inc.*, No. 17-cv-348, 2020 WL 759656 at *8 (W.D.N.Y. Feb. 7, 2020); and those where a plaintiff "worked from home in New York City" and "defendants communicated with her there in connection with that employment," *Int'l Healthcare Exchange, Inc.*, 470 F. Supp. 2d 345 at 358–59.

Through their communications with Ms. Kumar, Mr. Scott and Ms. Hornberger purposefully availed themselves of the privilege of conducting business in New York. Mr. Scott and Ms. Hornberger knew that Ms. Kumar worked from New York, permitted her to do so, and "regularly communicated with [her] . . . via email, phone, and virtual meeting" for a sustained period of time. SAC ¶¶ 32, 33, 122, 128. In addition, ElectrifAi designated her both as a "New York" employee and a "remote employee who worked from her home." *Id.* ¶¶ 29, 32, 126–28. And defendants, including Mr. Scott and Ms. Hornberger, facilitated her remote work by sending her a company laptop "to use while working remotely," and by issuing her a cell phone with a New York phone number. *Id.* at ¶ 34. Therefore, as in the above cases, Mr. Scott and Ms. Hornberger "transacted business" for purposes of personal jurisdiction under Section 302(a)(1). *See, e.g.,* *Williams*, 81 F. Supp. 3d at 271 (finding that non-New York defendants sufficiently transacted business with a remotely-working plaintiff where defendants sent her "all the materials she needed to do her job" and where plaintiff's emails "reveal[ed] a large amount of substantive work she undertook for the company while in Brooklyn").

In addition, Mr. Scott's and Ms. Hornberger's communications with Ms. Kumar bear a substantial nexus to Ms. Kumar's employment discrimination claims. Ms. Kumar's employment discrimination claims "arise out" of the work that Ms. Kumar did for Defendants while in New York. *See id.* at 272 ("[T]here is a 'substantial relationship' between the [remote] work plaintiff alleges she undertook for defendants and her claims in this suit, which arise out of her termination by defendants."). Moreover, many of Mr. Scott's and Ms. Hornberger's communications with Ms. Kumar allegedly constituted acts of discrimination. *See, e.g.,* SAC ¶ 92 (describing a "belittling" email Mr. Scott sent to Ms. Kumar after Ms. Kumar obtained revenue for ElectrifAi); *id.* ¶ 108 (describing an email sent by Mr. Scott to Ms. Kumar that "attacked" and "attempted to humiliate" her after they discussed issues related to ElectrifAi's government practice); *id.* ¶ 131 (describing an email Ms.

Hornberger sent to Ms. Kumar imposing obligations that were not imposed on similar employees). The communication of "work assignments that Plaintiff claims constitute[] instances of illegal disparate treatment . . . via telephone, email, and fax" can be "sufficient to demonstrate purposeful transaction of business that has a substantial nexus to Plaintiff's employment discrimination cause of action." *Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 359 (finding personal jurisdiction where a plaintiff working remotely in New York received emails that formed the basis of his anti-discrimination claim from his Chicago-based employer). Such is the case here.

Mr. Scott and Ms. Hornberger argue otherwise, pointing out that Ms. Kumar only received their communications in New York because she "chose to work remotely." *See* Dkt. No. 65, Hornberger Br. at 13; Scott Reply at 3–6. In essence, they suggest that personal jurisdiction is improper because they did not subjectively intend to purposefully avail themselves of New York's jurisdiction. But under Section 302(a)(1), "[d]etermining purposeful availment is an objective inquiry, which always requires a court to closely examine the defendant's contacts for their quality." *Fica Frio, Ltd.*, 434 F. Supp. 3d at 87 (quoting *Al Rushaid*, 45 N.Y.S. 3d at 282 (2016)); *cf. Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 467–68 (S.D.N.Y. 2008) ("An objective test— and not a subjective test—governs whether a defendant expects or should reasonably expect his act to have consequences within New York."). Here, as discussed, the objective qualities of Mr. Scott's and Ms. Hornberger's communications demonstrate their purposeful availment in New York: for instance, it is objectively true that the two knew Ms. Kumar lived and worked in New York, but nevertheless regularly communicated with her regarding her employment, and also that they provided her with a phone and laptop to facilitate this remote work. These objective indicia are sufficient to establish purposeful availment under Section 302(a)(1).

In addition, the cases upon which Mr. Scott and Ms. Hornberger rely can be distinguished. For instance, in *Beeney v. InSightec, Inc.*, the court found no personal jurisdiction where defendant-

employers communicated with a plaintiff working remotely.  No. 13-cv-8022, 2014 WL 3610941 (S.D.N.Y. July 7, 2014).[2]  But in that case, the plaintiff was "required to move to Texas as a condition of his employment," and was only "permitted to work remotely from New York while searching for housing in Dallas."  *Id.* at *1.  Here, Mr. Scott and Ms. Hornberger knew that Ms. Kumar had worked remotely from New York for a significant period of time and planned to do so indefinitely.  Moreover, *Beeney* expressly distinguished itself from cases where work assignments that "constitute[] repeated instances of disparate treatment" are communicated to a plaintiff working remotely, *see id.* at *3 n.5, as is the case here.

Accordingly, the Court may exercise personal jurisdiction over Mr. Scott and Ms. Hornberger under Section 302(a)(1) of New York's long-arm statute.

### 2)  The Court's Exercise of Jurisdiction over Mr. Scott and Ms. Hornberger Comports with Due Process

The Court's exercise of jurisdiction over Mr. Scott and Ms. Hornberger satisfies due process.  "To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances."  *Eades v. Kennedy, PC L. Off.*, 799 F.3d 161, 167–68 (2d Cir. 2015) (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)).  "As to the first requirement, 'we evaluate the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test.'"  *Id.* at 169 (quoting *Licci*,732 F.3d at 170).  "If

---

[2] The Court notes that there is scant support in New York law for Beeney's suggestion that a plaintiff bringing employment discrimination claims must point to "specific instances of [a defendant's] discriminatory conduct directed at New York" in order to satisfy personal jurisdiction over a non-domiciliary.  *Id.* at *3.  Rather, under New York law, a plaintiff must show that a cause of action is "sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business."  *PDK Labs, Inc.*, 103 F.3d at 1109 (quoting *Hoffritz for Cutlery, Inc.*, 763 F.2d at 59).

minimum contacts exist, the defendant has to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Licci*, 732 F.3d at 173).

"[D]espite the fact that section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, [the Second Circuit] would expect such cases to be rare." *Licci*, 732 F.3d at 170. "It would be unusual, indeed, if a defendant transacted business in New York and the claim asserted arose from that business activity within the meaning of section 302(a)(1), and yet, in connection with the same transaction of business, the defendant cannot be found to have 'purposefully availed itself of the privilege of doing business in the forum and to have been able to foresee being haled into court there,' or the assertion of specific jurisdiction would somehow otherwise 'offend traditional notions of fair play and substantial justice.'" *Id.* (citations and alterations omitted).

i.   Mr. Scott and Ms. Hornberger have Sufficient Minimum Contacts
     with New York to Satisfy Due Process

Here, Mr. Scott and Ms. Hornberger have sufficient minimum contacts with New York to satisfy the first prong of the due process inquiry. Under Second Circuit law, analysis of minimum contacts requires "evaluat[ion] [of] the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test." *Licci*, 732 F.3d at 170 (quoting *Best Van Lines Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)). "[T]here must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State. When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Meyers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1781 (2017) (citations and alterations omitted). As follows, "[a] defendant who deliberately engages in significant activities with or creates continuing obligations to residents of the forum state may be considered to have fair warning that claims arising from such

activity could subject them to jurisdiction in that forum." *Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 359–60.

Here, the totality of the circumstances demonstrates that Mr. Scott and Ms. Hornberger have sufficient minimum contacts with New York:  they deliberately sent work-related communications to Ms. Kumar—a long-time New York based employee—knowing that those communications would be received in New York State, and that effects of these communications would be felt there.  Those communications are affiliated with Ms. Kumar's employment discrimination claims (especially given that some of these communications allegedly furthered their discrimination against Ms. Kumar).  Accordingly, Mr. Scott and Ms. Hornberger had fair warning that their continuous communications with Ms. Kumar could expose them to liability in New York.[3] *See id.* (finding, in a case involving employment discrimination claims brought by a remote employee, that is was "reasonably foreseeable that misconduct in the exercise of [defendants'] supervisory authority over an employee might expose them to liability in the state of employment" where they regularly communicated with the plaintiff and those communications constituted acts of discrimination); *Winner*, 333 F. Supp. 3d at 264 (finding minimum contacts where "Defendant allegedly employed Plaintiff from her home in New York to provide marketing services in New York, communicated with her regularly in New York" and "[i]n the course of engaging with and providing those services for Defendant in New York, Plaintiff allegedly experienced discrimination  . . . by Defendant").  As such, there are sufficient minimum contacts to satisfy the first prong of the Court's due process inquiry.

---

[3] The case upon which Ms. Hornberger relies is inapposite.  In *Smith v. Railworks Corp.*, 2012 WL 752048 (S.D.N.Y Mar. 6. 2012), this district analyzed due process for purposes of general personal jurisdiction, not specific personal jurisdiction as is the case here because there were no allegations that defendants' contact with the forum arose out of the plaintiff's specific cause of action.  Here, by contrast, Ms. Kumar alleges specific instances (communications with Defendants) as a basis for specific jurisdiction.

ii.   Mr. Scott and Ms. Hornberger Do Not Demonstrate that the
Assertion of Due Process Renders Jurisdiction Unreasonable

Mr. Scott and Ms. Hornberger do not "present a compelling case that the presence of some

other considerations would render jurisdiction unreasonable" for purposes of due process.  *Eades*,

799 F.3d at 169 (quoting *Licci*, 732 F.3d at 173).  Relevant factors at this second step of the due

process analysis include "(1) the burden that the exercise of jurisdiction will impose on the

defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in

obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the

most efficient resolution of the controversy; and (5) the shared interest of the states in furthering

substantive social policies." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 568 (2d Cir. 1996)

(citing *Asahi Metal Indus. Co. v. Superior Ct. or Cal.,* 480 U.S. 102, 113-14 (1987)).

Here, none of the factors suggest that the exercise of personal jurisdiction over Mr. Scott

and Ms. Hornberger would be unreasonable.  Taking each defendant in turn, Mr. Scott resides in

Connecticut, works at a company based in New Jersey, and regularly works in New York.  *See, e.g.*,

SAC ¶¶ 13, 45, 51.  As such, any burden of litigating this case in New York would be minimal.  And

Ms. Hornberger, despite residing in California, works for a New Jersey-based company and is alleged

to have at times travelled to New Jersey for that work.  *See, e.g.*, SAC ¶¶ 94–97.  Thus, though travel

to the New York for this litigation may be an inconvenience, it is not the case that Ms. Hornberger

would be overly burdened so as to render jurisdiction unreasonable.

In addition, New York's "manifest interest in providing effective means of redress for its

residents," *see Eades*, 799 F.3d at 169, weighs in favor of litigating in New York, as does Ms. Kumar's

interest in obtaining convenient relief.  Nor have Mr. Scott or Ms. Hornberger made any showing

that the exercise of due process would undermine a shared interest in furthering substantive social

policies. *Del Ponte v. Universal City Dev. Partners, Ltd.*, No. 07-cv-2360, 2008 WL 169358, at *13

(S.D.N.Y. Jan. 16, 2008) (finding no due process concerns where defendants had not "demonstrated

any substantive social policies that would be furthered or undermined by permitting the case against [Defendants] to go forward in New York."). Accordingly, defendants have not made any showing that the exercise of personal jurisdiction over Mr. Scott and Ms. Hornberger would be unreasonable.

Thus, the requirements of New York's long arm statute and due process are satisfied, the Court's exercise of specific jurisdiction over Mr. Scott and Ms. Hornberger is proper. Accordingly, Mr. Scott's and Ms. Hornberger's motions to dismiss for lack of personal jurisdiction are DENIED.

## III.    Defendants' Motion to Dismiss or Transfer

Because venue is proper in the Southern District of New York and there are no significant factors weighing in favor of a transfer, the Court will not exercise its discretion to transfer the motion to the District of New Jersey.

### a)  The NDA's Forum Selection Clause Does Not Automatically Render Appropriate Venue in the Southern District of New York.

As an initial matter, the forum selection provision in Ms. Kumar's 2009 NDA with ElectrifAi's predecessor does not in and of itself render venue in the Southern District of New York appropriate. *See* SAC, NDA at § 10. To determine whether a forum selection clause mandates dismissal or transfer, courts ask (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory; and (3) whether the claims and parties involved in the suit are subject to the forum selection clause. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007).

Here, the parties dispute only the third element: whether the claims and parties involved in the suit are subject to the forum selection clause. Regarding this element, a forum selection clause is a "creature of contract." *Id.* at 387. Accordingly, to determine whether the claims at issue are subject to ta forum clause, the "inquiry is one of contract interpretation." *Id.* at 386. Specifically, to determine whether the underlying claims are subject to the forum selection clause, "[t]he court must 'examine the substance of [a plaintiff's] claims as they relate to the precise language' of the specific

clause at issue." *Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.*, 572 F.3d 86, 90 (2d Cir. 2009).

The forum selection clause in the NDA states that "the exclusive jurisdiction and venue with respect to any action, suit, or proceeding ***arising out*** of this Agreement shall be in the state or federal courts of New York, New York." SAC, Ex. A § 10 (emphasis added). The Second Circuit "construe[s] the phrase 'arise out of' in the forum selection context narrowly." *Palm Bay Int'l, Inc. v. Winebow Grp., LLC*, No. 07-cv-1094, 2018 WL 5776266, at *3 (E.D.N.Y. Nov. 1, 2018). The words arise out of are not understood "as encompassing all claims that have some possible relationship with the contract, including claims that may only 'relate to,' be 'associated with,' or 'arise in connection with' the contract." *Phillips*, 494 F.3d at 389. "This meaning is especially likely where parties wishing to designate a mandatory forum to hear a broader category of disputes are free to do so," such as by providing that claims "in any way related" to the agreement. *Id.* at 390. Instead, courts determine whether the underlying claims "originate from" the agreement containing the forum selection clause. *Id.* (explaining, with regard to a forum selection clause in a recording contract, "[t]o decide whether Phillips copyright claims arise out of the agreement, we are therefore required to determine if Phillips rights—here predicated on valid ownership of the copyrights to the 15 songs—originate from the recording contract").

Here, Ms. Kumar's employment discrimination claims do not "arise out" of the NDA. Ms. Kumar does not claim any breach of the NDA, nor does she allege that the NDA in any way prohibited the Defendants' allegedly wrongful acts.[4] Instead, her claims are brought under federal and state anti-discrimination law. *See* SAC at ¶¶ 177–246. Thus, because Ms. Kumar's claims in the

---

[4] Ms. Kumar also claims that the fact that the New Jersey court dismissed a case against her because it found the NDA's forum selection clause enforceable. *See* Dkt. Nos. 54-2, 53-4, Exhibits B and D to the SAC. That is also of no consequence here, because that suit expressly alleged that Ms. Kumar violated the NDA. *See* Exhibits B and D to the SAC. In other words, those claims clearly originated from the agreement.

instant action do not "arise out of the NDA," the claims in this case are not subject to the NDA's forum selection clause. *See Philips*, 494 F.3d at 389 (declining to apply a forum selection clause in a recording contract because claims brought under federal copyright law did not "arise out of" the recording contract); *Altvater Gessler*, 572 F.3d at 91 (declining to apply a forum selection clause in licensing agreements because the underlying claims "d[id] not sound in contract and [were] not based on rights originating from" the licensing agreements); *see also Palm Bay Int'l*, 2018 WL 5776266, at *4 (finding a forum selection clause did not apply where "the source of Plaintiffs' claims is federal law, not the Contract, because the claims may be raised without reference to the agreement"). In sum, the forum selection clause does not mandate venue in the Southern District of New York.

   b)   **The Court Will Not Exercise its Discretion to Dismiss this Case or Transfer it to the District of New Jersey under 28 U.S.C. § 1404(a) or 1406(a).**

         1.   **Venue in the Southern District of New York is Proper, so Analysis Under Section 1404(a) is Appropriate.**

As an initial matter, analysis of Defendants' motion to dismiss or transfer falls more properly under Section 1404(a) than Section 1406(a). Section 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Thus, this Section most readily applies when a case is brought in an improper forum. [5]

---

[5] The Court notes that "[d]espite the section's language suggesting that a § 1406 transfer should be made only if venue is laid in the wrong district, courts have read § 1406 broadly to allow transfers from districts in which venue was properly laid." *Spar, Inc. v. Info. Res., Inc.*, 956 F.2d 392, 394 (2d Cir. 1992). However, "[g]enerally, in cases in which a § 1406 transfer has been permitted notwithstanding proper venue, the transfer has enabled the parties to surmount an obstacle, such as lack of jurisdiction, which would have precluded suit in the transferor district." *Id.* Here, the parties do not identify any "obstacle" that would prevent litigation in the Southern District of New York. Thus, the Court understands § 1406(a) to apply in this case only if venue in not proper in the Southern District of New York.

Section 1404(a), by contrast, provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).  Section 1404(a) is only available when the court initiating the transfer is the proper venue and has personal jurisdiction over the defendant.  *Nebgen v. Schentag*, No. 18-cv-8410, 2020 WL 1529452, at *4 (S.D.N.Y. Mar. 31, 2020).

Here, venue is proper in the Southern District of New York, so Section 1406(a) does not apply.  Under 28 U.S.C. § 1391(b), venue is proper in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."

Here, Ms. Kumar argues that venue is proper under 28 U.S.C. § 1391(b)(2).  Transfer Opp'n at 12–13.  "[W]hen a plaintiff relies on § 1391(b)(2) to defeat a venue challenge, a two-part inquiry is appropriate. First, a court should identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims.  Second, the court should determine whether a substantial part of those acts or omissions occurred in the district where suit was filed, that is, whether 'significant events or omissions material to [those] claim[s] . . . have occurred in the district in question.'"  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005) (citation omitted).

"'Substantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts."  *Id.* at 432–33.  Courts "are required to construe the venue statute strictly."  *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d

353, 357 (2d Cir. 2005). It "would be error, for instance, to treat the venue statute's 'substantial part' test as mirroring the minimum contacts test employed in personal jurisdiction inquiries." *Id.* "Rather, '[o]nly the events that directly give rise to a claim are relevant.'" *Ne. Landscape & Masonry Assocs., Inc. v. State of Connecticut Dep't of Lab.,* No. 14-cv-9104, 2015 WL 8492755, at *3 (S.D.N.Y. Dec. 10, 2015) (quoting *Fedele v. Harris,* 18 F. Supp. 3d 309 (E.D.N.Y. 2014)). Accordingly, "[w]hen material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial." *Daniel,* 428 F.3d at 433.

As to the first prong of the Court's § 1391(b) inquiry—the nature of the claims—the causes of action center on Defendants' discrimination against Ms. Kumar that affected her employment, including her wrongful termination. *See Fedele,* 18 F. Supp. 3d at 317 (describing the nature of the claims as such where the plaintiffs brought claims that government employees had schemed to terminate them in retaliation for exercising their constitutionally protected rights).

As to the second, a "substantial part" of the events giving rise to Ms. Kumar's claim took place in Manhattan, rendering proper venue in the Southern District of New York. Defendant White Oak made the decision to retain Mr. Scott as CEO following an investigation into his discriminatory conduct from its New York office. SAC ¶ 121. In addition, the Complaint alleges that "Mr. Scott was employed out of White Oak's Manhattan offices . . . until in or around March 2020." SAC ¶ 59. Given Ms. Kumar's allegation of Mr. Scott's repeated discrimination against her, it is reasonable to infer that at least some of Mr. Scott's discrimination occurred in Manhattan. Moreover, because Ms. Kumar had a home in Manhattan, she felt the effects of her termination there. "The place where the harm occurred is relevant for venue purposes." *New York Mercantile Exch. v. Cent. Tours Int'l, Inc.,* No. 96-cv-8988, 1997 WL 370600, at *4 (S.D.N.Y. July 1, 1997) (finding venue in the Southern District of New York where, among other things, the plaintiff "allege[d] that it suffered financial loss in New York as a result of defendants' acts"); *Fedele,* 18 F. Supp. 3d at 318

(commenting that "the Court considers the situs of the alleged harm as a factor in its venue analysis"). Therefore, Ms. Kumar has shown that a "substantial part" of the events giving rise to her claims took place within the Southern District of New York.

Defendants argue that "[n]o part of the events giving rise to Plaintiff's claims are alleged to have occurred in New York," but that instead Defendants' actions took place in New Jersey. Transfer Mot. at 7–8. First, it is not the case that "nothing" happened in New York—as mentioned Defendant White Oak made the decision not to remove Mr. Scott as CEO in its Manhattan offices, and Ms. Kumar felt the effects of her termination there. Second, even if substantial events also occurred in New Jersey, venue "is not restricted to the district with the 'most substantial' connection to the events or omissions related to a claim." *Ne. Landscape & Masonry Assocs., Inc.*, 2015 WL 8492755, at *3 (S.D.N.Y. Dec. 10, 2015) (quoting *Prospect Cap. Corp. v. Bender*, No. 09-cv-826, 2009 WL 4907121, at *3 (S.D.N.Y. Dec. 21, 2009). Rather, "venue can be proper in more than one district." *Id.* (quoting *Bender*, 2009 WL 4907121, at *3).

In sum, because a substantial part of the events giving rise to Ms. Kumar's claims took place in Manhattan, and because Ms. Kumar felt the effects of her termination in Manhattan, venue is proper in the Southern District of New York. Thus, to the extent Defendants' motion to dismiss for improper venue seeks dismissal of this action under Section 1406(a), that motion is DENIED.

### 2. The Court Will Not Exercise Its Discretion to Transfer Under 28 U.S.C. § 1404(a).

Because venue in the Southern District of New York is proper, the Court proceeds to analyze whether it should nonetheless exercise its discretion to transfer this case under § 1404(a). Here, it should not. The Court evaluates a potential transfer pursuant to § 1404(a) in two steps. First, the Court must ask whether the case "might have been brought in the proposed transferee district." *See Herbert Ltd. P'ship v. Elec. Arts Inc.*, 325 F. Supp. 2d 282, 285 (S.D.N.Y. 2004). An action "might have been brought" in the proposed transferee district if venue, personal jurisdiction,

and subject matter jurisdiction would have been proper in the transferee court at the time of filing.

*City of Pontiac Gen. Empls. Ret. Sys. v. Dell Inc.*, No. 14-cv-3644, 2015 WL 12659925, at *2 (S.D.N.Y.

Apr. 30, 2015).

If the threshold inquiry is satisfied, the Court proceeds to the second step and determines

whether a transfer is appropriate. *See id.* In so doing, the Court considers the following factors to

determine whether to grant the requested transfer:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location
> of relevant documents and the relative ease of access to sources of proof; (4) the locus
> of operative facts; (5) the availability of process to compel the attendance of unwilling
> witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the
> governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial
> efficiency and the interests of justice.

*Multiwave Sensor Inc. v. Sunsight Instruments, LLC*, No. 1:16-cv-1361, 2017 WL 1498058, at *6

(S.D.N.Y. Apr. 26, 2017). The list of factors is not exhaustive. *Pausch Med. GmbH v. Pausch LLC*,

No. 14-cv-1945, 2015 WL 783365, at *1 (S.D.N.Y. Feb. 24, 2015). Furthermore, "[t]here is no rigid

formula for balancing these factors[,] and no single one of them is determinative." *Citigroup Inc. v.*

*City Holding Co.*, 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000). Rather, "weighing the balance is

essentially an equitable task left to the Court's discretion." *Id.* (internal quotation marks omitted).

District courts have broad discretion in deciding, on a case-by-case basis, whether to transfer the

venue of a given litigation based on "notions of convenience and fairness." *D.H. Blair & Co., Inc. v.*

*Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006).

As to the threshold question, Ms. Kumar's action against ElectrifAi might have been

brought in New Jersey. ElectrifAi has its headquarters in New Jersey, and the decision to terminate

Ms. Kumar was made there, rendering venue in the District of New Jersey appropriate. *See Fteja v.*

*Facebook, Inc.*, 841 F. Supp. 2d 829, 834 (S.D.N.Y. 2012) (commenting that venue would be proper in

the Northern District of California because "the nub of Fteja's claim is that Facebook wrongfully

disabled his account and the employees responsible for disabling accounts work at Facebook's

headquarters in Palo Alto, California which is in the Northern District of California"). So too would the company's headquarters in New Jersey render it subject to New Jersey's general jurisdiction. *See id.* (general personal jurisdiction would likely be found in the California because "the presence of Facebook's headquarters in Palo Alto suggests that Facebook has had "continuous and systematic general business contacts" in that state).

Whether Ms. Kumar's action against the other defendants could have been brought in New Jersey is less certain. Indeed, aside from a footnote in Plaintiff's Transfer Opposition that states that it is "unclear" whether venue would be proper for the individual defendants in the District of New Jersey, Transfer Opp'n at 16 n. 20, the parties do not address whether Ms. Kumar could have brought this action against Mr. Scott, Ms. Hornberger , or any of the White Oak Entities, in the District of New Jersey. However, as explained below, even if she could have brought this action in the District of New Jersey, analysis of the relevant factors demonstrates that transfer to the District of New Jersey would not be appropriate.

### 1.  The Convenience of the Witnesses is Neutral

"Convenience of both the party and non-party witnesses is probably the single most important factor in the analysis of whether transfer should be granted." *Steck v. Santander Consumer USA Holdings Inc.*, No. 14-cv-6942, 2015 WL 3767445, at *2 (S.D.N.Y. June 17, 2015) (alteration omitted) (quoting *Mazuma Holding Corp. v. Bethke*, 1 F. Supp. 3d 6, 29–30 (E.D.N.Y. 2014)). In conducting this analysis, the Court "weighs more heavily the convenience of non-party witnesses than party witnesses." *McGraw-Hill Cos Inc. v. Jones*, No. 12-cv-7085, 2014 WL 988607, at *7 (S.D.N.Y. Mar. 12, 2014). The party moving for transfer "must provide the Court with a detailed list of probable witnesses who will be inconvenienced if required to testify in the current forum." *Kiss My Face Corp. v. Bunting*, No. 02-cv-2645, 2003 WL 22244587, at *2 (S.D.N.Y. Sept. 30, 2003). The Court "does not merely tally the number of witnesses who reside in the current forum in

comparison to the number located in the proposed transferee forum"; but rather "must qualitatively evaluate the materiality of the testimony that the witnesses may provide." *Herbert Ltd. P'ship v. Elec. Arts Inc.*, 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004).

Here, litigation in New York is not significantly more burdensome to party or non-party witnesses in the Southern District of New York than the District of New Jersey. The Manhattan and Newark courthouses of the Southern District of New York and the District of New Jersey respectively are only 13 miles away from each other. Declaration of Jeremiah Iadevaia, Dkt. No. 69 at ¶¶ 4–5. Any witnesses called to testify would not face a significant burden to appear in the District of New Jersey as opposed to the Southern District of New York. In addition, the majority of potential non-party witnesses that Ms. Kumar identifies, *see* Kumar Decl. ¶¶ 47–48, live in New York and work in New Jersey and there is no reason to believe that travel to one courthouse as opposed to the other would be significantly more burdensome for these individuals. *See* Kumar Decl. ¶¶ 47a–48c. Thus, this factor is neutral.

### 2. The Convenience of the Parties is Neutral

"The convenience of the parties favors transfer when transfer would increase convenience to the moving party without generally increasing the inconvenience to the non-movant." *Liberty Mut. Ins. Co. v. Fairbanks Co.,* 17 F. Supp. 3d 385, 389 (S.D.N.Y. 2014). Here, given the geographic proximity between the two districts, there is no reason that Ms. Kumar would be generally inconvenienced by litigation in New Jersey, but neither would Defendants' convenience be substantially increased. Thus, this factor is neutral.

### 3. The Location of Relevant Documents and Sources of Proof Weighs Minimally in Favor of Transfer

The location of relevant documents is "entitled to relatively little weight in the modern era of faxing, scanning, and emailing documents." *McGraw-Hill Cos.*, 2014 WL 988607, at *9 (internal quotation marks omitted). However, "it is improper to ignore [it] entirely." *In re Link_A_Media*

*Devices Corp.*, 662 F.3d 1221, 1224 (Fed. Cir. 2011). ElectrifAi's employment records are maintained and administered in Jersey City, New Jersey. SAC ¶¶ 45, 94. However, Jersey City lies in close geographic proximity to the Southern District of New York, such that this factor weighs only minimally in favor of transfer.

### 4.  The Locus of Operative Facts is Neutral

The locus of operative facts similarly does not weigh heavily in either direction. To determine the locus of operative facts, courts "look to the site of the events from which the claim arises." *Ivy Soc'y Sports Grp., LLC v. Balconesto Superior Nacional*, 2009 WL 2252116, No. 08-cv-8106, at *6 (S.D.N.Y. July 28, 2009) (quoting *AVEMCO Ins. Co. v. GSV Holding Corp.*, No. 96-cv-8323, 1997 WL 566149, at *6 (S.D.N.Y. Sept. 11, 1997)). The Court is mindful that many communications were sent from New Jersey, and that Ms. Kumar attended certain meetings in New Jersey where discriminatory conduct is alleged to have occurred. *See Tillery v. NYS Office of Alcoholism & Substance Abuse Servs.*, No. 13-cv-0035, 2013 WL 6405326, at *5 (S.D.N.Y. Dec. 5, 2013) (finding where plaintiff's supervisors who were alleged to have discriminated against him "were located in Albany, the discriminatory acts occurred in Albany.") However, as discussed herein, Ms. Kumar exchanged numerous communications with Defendants while working from New York, and experienced the significant instances of Defendants' discrimination and her eventual termination in New York and, more specifically, Manhattan. "Where the locus of operative facts is split amongst several forums . . . courts have, at minimum, viewed this factor neutrally." *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 324 F. Supp. 3d 366, 381 (W.D.N.Y. 2018). Accordingly, this factor is largely neutral.

### 5.  The Availability of Process to Compel the Attendance of Unwilling Witnesses is Neutral

All parties concede that this factor is neutral. Defs.' Reply at 10; Transfer Opp'n at 20.

6.  The Relative Means of the Parties is Neutral

All parties again concede that this factor is neutral.  Defs.' Reply at 10; Transfer Opp'n

at 20.

7.  The Forum's Familiarity with the Governing Law Weighs Slightly
    Against Transfer

As to the forum's familiarity with the governing law, Ms. Kumar points out that a New York

court, "whether state or federal," is in a better position to interpret her claims under New York state

and city law.  Transfer Opp'n at 20.  While a New York court may be better versed in such claims, it

is also true that "federal courts are deemed capable of applying the substantive law of other states."

*KPMG Consulting, Inc. v. LSQ II, LLC*, No. 01-cv-11422, 2002 WL 1543907, at *5 (S.D.N.Y. July 12,

2002) (quoting *Astor Holdings, Inc. v. Roski*, No. 01-cv-1905, 2002 WL 72936, at *1 (S.D.N.Y. Jan. 17,

2002)).  Here, then, this factor weighs slightly toward plaintiff, but is largely neutral.

8.  Trial Efficiency and the Interests of Justice Weighs Slightly Against
    Transfer

"The Court's consideration of whether transfer is in the interest of justice is based on the

totality of the circumstances, and relates primarily to issues of judicial economy."  *Indian Harbor Ins.*

*Co. v. Factory Mut. Ins. Co.*, 419 F. Supp. 2d 395, 407 (S.D.N.Y. 2005) (internal quotation marks and

citations omitted).  "While relative calendar conditions are a consideration in deciding section

1404(a) motions, they are never a factor to which great weight is assigned."  *DiPizio v. Empire State*

*Dev. Corp.*, No. 15-cv-5339, 2015 WL 5824704, at *9 (S.D.N.Y. Oct. 5, 2015) (quoting *Artoptic Int'l*

*Corp. v. Rio Optical Corp.*, No. 91-cv-1270, 1992 WL 170674, at *2 (S.D.N.Y. July 8, 1992)).

Furthermore, "[w]hen a case is in its earliest stages, it is generally not inefficient to transfer the case."

*Starr Indem. & Liab. Co. v. Brightstar Corp.*, 324 F. Supp. 3d 421, 441 (S.D.N.Y. 2018) (quoting *Royal*

*& Sun All. Ins., PLC v. Nippon Express USA, Inc.*, 202 F. Supp. 3d 399, 411 (S.D.N.Y. 2016)).  Here,

though the Court assigns little weight to this factor, the early stage of this litigation weighs slightly against transfer.

9. The Plaintiff's Choice of Forum Weighs Against Transfer

Given the relative neutrality of the other factors, the plaintiff's choice of forum here is decisive. "[B]ecause the [Court's] discretion under Section 1404 'must be exercised at the very outset of the case, when relatively little is known about how the case will develop, courts have typically accorded substantial weight to the [eighth] factor, plaintiff's choice of forum.'" *Freeplay Music, LLC v. Gibson Brands, Inc.*, 195 F. Supp. 3d 613, 616 (S.D.N.Y. 2016) (quoting *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 695 (S.D.N.Y. 2009)). Indeed, "'a plaintiff's choice of forum is presumptively entitled to substantial deference' . . . That presumption is even stronger where the chosen forum is also the plaintiff's home." *Atl. Recording Corp.*, 603 F. Supp. 3d. at 698 (quoting *Gross v. BBC*, 386 F.3d 224, 230 (2d Cir. 2004)). However, the deference accorded to a plaintiff's choice of its home forum diminishes when the chosen forum lacks a material connection to the operative facts. *Capitol Records, LLC v. VideoEgg, Inc.*, 611 F. Supp. 2d 349, 368 (S.D.N.Y. 2009).

The decision of Ms. Kumar, a resident of Manhattan, to litigate this case in the Southern District of New York is thus entitled to substantial deference. As explained herein, the operative facts underlying Ms. Kumar's discrimination bear a material connection to the Southern District of New York, given Defendants' communications with Ms. Kumar while she was in Manhattan, and the fact that Ms. Kumar felt the effects of her termination in the city. Thus, Ms. Kumar's decision to bring this action in this District weighs heavily against transfer. Accordingly, because the other

factors are largely neutral or weigh slightly against transfer, transfer is not appropriate under §

1404(a), and the Court will not exercise its discretion to transfer this case under that provision.

### 3. Venue for Ms. Kumar's Title VII Claims Is Proper in the Southern District of New York.

Neither is a transfer of venue appropriate for Ms. Kumar's Title VII claims.  "Claims under

Title VII are strictly governed by [Title VII's] venue provisions, rather than by the general venue

statute." *Templeton v. Veterans Admin.*, 540 F. Supp. 695, 696 (S.D.N.Y. 1982).  Title VII claims may

be brought "in any judicial district in the State in which the unlawful employment practice is alleged

to have been committed, in the judicial district in which the employment records relevant to such

practice are maintained and administered, or in the judicial district in which the aggrieved person

would have worked but for the alleged unlawful employment practice."  42 U.S.C. § 2000e-5(f)(3).

Venue is proper in the Southern District of New York under the first and third prongs.  As

to the first, to determine "where an alleged discriminatory practice occurred, courts look not only to

where the decisions were made, but also to where the discriminatory actions took place."  *Foley v.*

*Sammons Preston, Inc.*, No. 03-cv-5485, 2004 WL 35438, at *2 (S.D.N.Y. Jan. 6, 2004).  As previously,

Ms. Kumar has sufficiently alleged that Defendants made decisions adverse to her employment

interests in New York,[6] pointing out that Defendants, while in New York, chose not to remove Mr.

Scott from his position as CEO in the wake of an investigation into his alleged wrongdoing.

Defendants also targeted numerous discriminatory communications to Ms. Kumar knowing that she

was located in New York, and Ms. Kumar felt the effects of Defendants' discrimination and her

ultimate termination in New York.  This is sufficient to show that the unlawful employment practice

---

6 Whether the discrimination took place in Manhattan or Ithaca is irrelevant to the Court's determination of proper venue, since the Second Circuit construes Title VII's venue provisions "to mean that venue is not limited to the particular district in which the alleged unlawful acts occurred, but rather that venue is proper, as the plain language of the statute provides, in any judicial district in the *State* in which the alleged unlawful acts occurred." *Banfield v. UHS Home Attendants, Inc.*, No. 96-cv-4850, 1997 WL 342422, at *1 (S.D.N.Y. June 23, 1997) (emphasis in the original).

was committed in New York.  *See id.* (finding venue in the Southern District of New York proper for Title VII claims where the plaintiff "worked in New York and lost her job in New York"); *Garrel v. NYLCare Health Plans, Inc.*, 1999 WL 459925, at *3 (S.D.N.Y. June 29, 1999) (finding that venue in Maryland was proper where the plaintiff "allege[d] that he was hired, worked, discriminated against, and fired in Maryland").

As to the third, at this early stage of the pleading, Ms. Kumar has sufficiently alleged that, but for her termination, she would have continued working in New York.  SAC ¶ 31.  Defendants' argument that Ms. Kumar would have worked in New Jersey absent any discrimination are belied by the fact that Ms. Kumar primarily worked from home beginning in August 2017, before the bulk of Defendants' discriminatory actions began.  *Id.* ¶¶ 31, 75 (noting that Ms. Kumar's "first meeting" with Mr. Scott occurred in October 2018).  Thus, Ms. Kumar would have continued working in New York but for her wrongful termination, and venue for her Title VII claims is proper in the Southern District of New York.  Accordingly, Defendants' motion to transfer this case to the District of New Jersey is DENIED.

## IV.    CONCLUSION

Based on the foregoing, the Court's exercise of personal jurisdiction over Mr. Scott and Ms. Hornberger is proper.  In addition, venue is proper in the Southern District in New York , and there is no significant interest in transferring the case to the District of New Jersey.  Accordingly, Mr. Scott and Ms. Hornberger's motions to dismiss for lack of personal jurisdiction is DENIED and Defendants' motion to dismiss this case for improper jurisdiction, or in the alternative, to transfer this case to the District of New Jersey is DENIED.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 59, 60, and 64.

SO ORDERED.

Dated:  September 28, 2021
New York, New York

_____
GREGORY H. WOODS
United States District Judge